#24040-rev & rem-JKK

**2007 SD 75**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                                   Plaintiff and Appellee,

    v.

FRED PACKED, JR.,                                   Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
BENNETT COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE KATHLEEN F. TRANDAHL
Judge

\* \* \* \*

LAWRENCE E. LONG
Attorney General

FRANK GEAGHAN
Assistant Attorney General                          Attorneys for plaintiff
Pierre, South Dakota                                and appellee.

TIMOTHY J. RENSCH of
Rensch Law Office, APLC                             Attorney for defendant
Rapid City, South Dakota                            and appellant.

\* \* \* \*

ARGUED ON APRIL 24, 2007

OPINION FILED **07/18/07**

#24040

KONENKAMP, Justice

[¶1.]     Defendant was convicted in a jury trial of first degree rape and sexual contact with a child who lived in his home.  He was sentenced to life plus twenty–five years.  Because we conclude that several trial errors deprived him of a fair trial, we reverse and remand for a new trial.

### Background

[¶2.]     E.S.B., who was eight at the time of the incidents in question, lived with Shanna and Fred Packed, Jr. (defendant).  The child referred to them as "mom" and "dad," but Shanna is actually E.S.B.'s maternal grandmother.  According to Shanna, E.S.B.'s natural mother, Betty DuBray, and natural father, Gordon DuBray, "didn't want her," and so the child moved in with Shanna when she was two.  In the summer of 2003, Shanna, defendant, and E.S.B. lived in a brown house in Martin, South Dakota.  Her natural mother and father lived at Sunrise Housing Addition, several miles away.

[¶3.]     Around June 6, 2003, Shanna was hospitalized in Rapid City, South Dakota with a broken jaw.  According to Shanna, defendant drove her to Rapid City.  Shanna recounted that while she was in the hospital, defendant was E.S.B.'s primary caretaker.  During this same time, defendant said he was working two jobs.  When Shanna returned from the hospital, she noticed some blood in E.S.B.'s underwear and questioned her about it.  E.S.B. denied that anything had happened to her and said that the underwear belonged to her sister.  Shanna did nothing further.

-1-

[¶4.] Later that summer or early fall, Shanna, defendant, and E.S.B. moved into a blue house in Sunrise Housing Addition. They were now living close to E.S.B.'s natural mother, Betty. In September 2003, Shanna and Betty noticed "a light green stain" on E.S.B.'s underwear. She and Betty questioned E.S.B. about it. According to Shanna, Betty angrily asked E.S.B. who had been messing around with her. When E.S.B. gave no response, Betty asked if "Gordon" or "Fred" had been messing around with her, to which E.S.B. replied that Fred (defendant) had. According to Betty, she did not do anything with this information, except leave the room upset.

[¶5.] In January 2004, the Department of Social Services (DSS) received a report about alleged abuse of E.S.B. A social worker investigated by first speaking with E.S.B. at her school in Allen, South Dakota. E.S.B. was in the third grade. She told the DSS worker that defendant had touched her sometime between Halloween and Thanksgiving and her mom, Shanna, had found baby oil when they moved. She also told the social worker that her younger sister was there and saw it all happen. Although the authorities first thought E.S.B. was describing abuse that had occurred recently, they later realized that E.S.B. was speaking about an incident of improper touching that had happened while she was living in the brown house the previous summer.

[¶6.] Law enforcement officers continued their investigation. They spoke with Shanna and attempted to collect the underwear and baby oil as evidence. The underwear had been washed, but Shanna gave it to them anyway. She also gave them the bottle of baby oil. Shanna told the officers that when she noticed the stain

in the underwear she told defendant about it and he told her to take E.S.B. to the doctor. Shanna also told the authorities about a neighbor boy who had called her, swore at her, and said rude things to her, all while claiming he was E.S.B.'s boyfriend. Sheriff John Walker gave the information about the neighbor boy, D.H., to Martin City Police Chief Shane Valendra. Nothing else was done with regard to this information by Sheriff Walker or Police Chief Valendra.

[¶7.] Police Chief Valendra and Sheriff Walker took E.S.B. and her younger sister to Rapid City for a forensic interview and medical examination. Lora Hawkins conducted a forensic interview of E.S.B. and Dr. Lori Strong, a pediatrician specializing in the field of child abuse, examined her. The videotape recording of E.S.B.'s interview shows a shy and reticent child, who volunteered little information. Each bit of detail about the incidents had to be painstakingly obtained with careful, age-appropriate questions. The interview lasted approximately forty-five minutes. When the questions centered on inconsequential activities, E.S.B. answered without reluctance. However, when questioned about defendant and inappropriate touching, E.S.B.'s demeanor noticeably changed. Her answers were reserved and given in a low voice.

[¶8.] E.S.B. told Hawkins that defendant had touched her four times in her room in the brown house while her mom was in the hospital. She also said that he touched her "peaches" with his hand. Later during the interview she said that defendant had laid on top of her with her pants down and touched her "peaches" with his "hot dog." This was after E.S.B. repeatedly stated that her pants were up, as were his, and that he never went inside her underwear. During the interview,

Hawkins left to speak with Sheriff Walker and Police Chief Valendra to see if there was anything they wanted her to explore. When she returned, she questioned E.S.B. about the baby oil and whether her younger sister was in the room when the touching occurred. E.S.B. denied that her younger sister was there and had no information about the baby oil. Nothing was asked of her about D.H., the neighbor boy.

[¶9.]     Defendant was indicted on charges of first degree rape of a child under ten and sexual contact with a child under sixteen "on or between June, 2003 and January 6, 2004." Defendant moved for a bill of particulars, which was granted. The State filed the bill limiting the time of the alleged offense to "on or between June 6-11, 2003." At trial, upon motion of the defense, the time frame was further limited to "on or between June 6-9, 2003." When the indictment was read to the jury, the State agreed to modify the time frame to comply with the agreed dates. Also, in the court's preliminary jury instructions, the dates recited were "on or between June 6-9, 2003."

[¶10.]     Before trial, the State moved in limine to preclude defendant from presenting evidence of a third-party perpetrator. Defense counsel responded that what he intended to introduce was not necessarily third-party perpetrator evidence. He intended to cross examine Shanna, Sheriff Walker, and E.S.B. about the neighbor boy, D.H., and how Shanna and Betty had concerns about E.S.B. "running around" with him. This line of questioning, counsel asserted, supported his theory of the defense that E.S.B. was fabricating the allegations against defendant to avoid getting in trouble for having a boyfriend. The court granted the State's motion in

limine, concluding that nothing linked D.H. to the alleged crimes, and thus, as third-party perpetrator evidence, it was inadmissible.

[¶11.] While testifying at trial, E.S.B. was even more reticent than when she was interviewed by the forensic interviewer. On a number of occasions, the State had to repeat its questions before she would respond. On the specifics of the rape charge, she said that while her underwear was down and defendant's pants and underwear were down, defendant touched her "middle" with his "middle." Shanna and Betty also testified. They described how they found the stains in E.S.B.'s underwear and questioned her about it. Shanna was asked about D.H. by defense counsel in an offer of proof outside the presence of the jury. She acknowledged that she had concerns. Betty admitted to angrily questioning E.S.B. with Shanna there.

[¶12.] Sheriff Walker testified that he felt Shanna was uncooperative during the investigation. He believed that she was attempting to protect defendant. Again outside the presence of the jury, defense counsel asked Sheriff Walker whether one of the reasons he believed Shanna was uncooperative was because she mentioned that D.H. claimed to be E.S.B.'s boyfriend. Sheriff Walker agreed that such contributed to his opinion, but that there were other factors.

[¶13.] Dr. Strong told the jury that E.S.B.'s examination was normal. However, she explained that the majority of children who are sexually abused have normal physical examinations. She testified that it would not be unusual to see such reluctance in testifying for a child of E.S.B.'s age. Forensic examiner Hawkins testified about her interview and how in her opinion E.S.B. was molested at least twice, even though she claimed to have been touched four times. Hawkins

explained that she believed E.S.B.s' revelation was not a "purposeful disclosure." E.S.B., according to Hawkins, loved defendant and "it is hard to separate the person from the actions sometimes." The video from her interview with E.S.B. was played for the jury.

[¶14.]     Defendant presented the testimony of his previous attorney, Alvin Pahlke. Apparently, Shanna had taken E.S.B. to see Pahlke for a private interview during the time he was representing defendant. Pahlke testified that E.S.B. told him that defendant did not touch her "peaches" and she wanted him to come home.

[¶15.]     In its final instructions to the jury, the court included an instruction, over defendant's objection, stating that although "[t]he Indictment charges that the offense was committed 'on or between' a certain date[,]. . . [i]t is sufficient if the evidence establishes beyond a reasonable doubt that the offense was committed on a date reasonably near the date alleged."

[¶16.]     Defendant was found guilty of both charges, admitted to being a habitual offender, and was sentenced to life plus twenty-five years. He appeals asserting that (1) he was improperly prevented from pursuing evidence of his theory of the defense; (2) the court erred when it used the "on or about" instruction; (3) there was insufficient evidence of penetration to support the rape conviction; (4) Sheriff Walker was improperly permitted to testify that a victim's statements are likely to change during the course of an investigation; and (5) the court erred when it allowed certain testimony of the forensic interviewer.

## Standard of Review

[¶17.]    Decisions to admit or deny evidence are reviewed under the abuse of discretion standard.  Steffen v. Schwan's Sales Enterprises, Inc., 2006 SD 41, ¶19, 713 NW2d 614, 621 (citations omitted).  For jury instructions, the following is our standard of review:

> A trial court has discretion in the wording and arrangement of its jury instructions, and therefore we generally review a trial court's decision to grant or deny a particular instruction under the abuse of discretion standard.  *See* Luke v. Deal, 2005 SD 6, ¶11, 692 NW2d 165, 168; Parker v. Casa Del Rey-Rapid City, Inc., 2002 SD 29, ¶5, 641 NW2d 112, 115-16.  However, no court has discretion to give incorrect, misleading, conflicting, or confusing instructions:  to do so constitutes reversible error if it is shown not only that the instructions were erroneous, but also that they were prejudicial.  First Premier Bank v. Kolcraft Enterprises, Inc., 2004 SD 92, ¶40, 686 NW2d 430, 448 (citations omitted).

Vetter v. Cam Wal Elec. Co-op., Inc., 2006 SD 21, ¶10, 711 NW2d 612, 615.  "The denial of a motion for judgment of acquittal presents a question of law, and thus our review is de novo."  State v. Disanto, 2004 SD 112, ¶14, 688 NW2d 201, 206 (citing United States v. Staula, 80 F3d 596, 604 (1stCir 1996)).

## Analysis and Decision

### 1.  Theory of the Defense

[¶18.]    Defendant asserts that "the third-party perpetrator ruling was misapplied in contravention of the rules of evidence in such a way as to disallow the presentation of a complete defense theory and to violate rights of confrontation."  When the court prevented the defense from inquiring into whether E.S.B. fabricated the allegations because of her supposed relationship with a neighbor boy, its ruling was based on its belief that defendant was attempting to offer evidence of a third-

party perpetrator.[1] Defendant maintains that while the evidence was construed as third-party perpetrator evidence, it was, in fact, evidence establishing his defense. In pursuit of this defense, defendant argues that he had the right to cross examine Shanna, Betty, Sheriff Walker, and E.S.B. about the neighbor boy.[2]

[¶19.] In regard to Sheriff Walker, defendant claimed that the State opened the door on the neighbor boy issue when it inquired into why the sheriff believed Shanna was not cooperative during the investigation. The court prohibited

---

1. In ruling on the State's motion in limine, the court stated, "I don't think you can say both things. I don't think you can say, well, we are just going into inconsistent statements, but they do point a finger at a third person." Defense counsel responded, "So, to order me at this point not to get into anybody else possibly doing something that would have caused her to say these things, would be to deprive a defendant of a meaningful opportunity to be heard and an opportunity to cross-examine the key witness in a case that revolves around credibility." The court's final ruling: "I agree, he can go into inconsistent statements. If you are going to go into further evidence, then you are going to have to come in and — so the motion is granted, I will allow inconsistent statements. But if you go further than that, you will have to come back and ask permission."

2. In response to the State's motion in limine, defense counsel argued,

> I am not conceding that it is third party perpetrator evidence. I can see where someone would say it is that. If she has made statements to others it was someone else, certainly we would have a right to ask her about that. I don't have a – you know, it is not like the State versus Luna case where they brought in a bunch of witnesses saying that a guy had blood on his hand and was off like that. I really think that I can get into this stuff without providing any notice, because it involves statements of the alleged victim, and my cross-examination of her is what it will be. I just wanted the [c]ourt to know that, yeah, we've got some statements out there where she said different things and I plan on getting into those, and I don't want to be precluded based upon a granting of third-party perpetrator motion. I don't have people lined up to come in and show that, you know, someone else did this. It is our position that this did not occur, that Fred did not do this. So from that standpoint, the third-party perpetrator is really irrelevant in the sense
>
> (continued . . .)

defendant from engaging in this line of questioning. In making his offer of proof,

defendant elicited the following testimony from Sheriff Walker:

> Q: Sir, on cross-examination, we were talking a little bit about the matter that you felt that Shanna Packed was misleading you on. I'm looking at page five of five of your report, where there is a statement about [D.H.].
> A: Yes.
> Q: Is that what you were talking about?
> A: That was one of the incidents, but I don't recall specifically when you were asking the question. Now that you brought it to my attention, yes, that is one of the incidents.
> Q: What was it she said to you that you felt was misleading?
> A: I felt that she was trying to lead me away from Mr. Packed in the investigation. And point blame to, on a - - this young man.
> Q: Okay. And tell the [c]ourt what she said in that regard.
> A: She said that he had called, [D.H.] had called her, and that he said that he was her boyfriend. And that he called her a fat bitch on the phone.
> Q: Okay, and what did you say immediately before, which caused her to say that?
> A: Can I look at my - -
> Q: Please.
> A: The only other people that would be taking care of Shanna [sic], I asked her who all would be taking care of Shanna [sic].
> Q: Okay.
> A: And she said the only other people would be Shanna's [sic] mother and father.
> Q: You mean [E.S.B.]'s?
> A: [E.S.B.]'s mother and father.
> Q: Which would be Betty and Gordon.
> A: Gordon, yeah.
> Q: It was after that then, she was telling you the story about the neighborhood boy?
> A: Yeah, she went right into the story about the neighbor boy.
> Q: And you felt that was [a] reference to the stains in the panties, is that correct?

_____

(. . . continued)

> that we are not saying that was what she said happened with Fred, even happened. So that's our position.

-9-

A: I felt that - - I had been talking to her about the panties and about Mr. Packed, and she wanted - - I felt she was leading me to think that somebody else may have had contact with her, and that [E.S.B.] had this boyfriend, this [D.H.].

Q: Say that last part again, I didn't hear you.

A: I felt that she was trying to point me in the direction of another suspect in the investigation. Which would be this young boy [D.H.].

Q: Did you take any steps to track this boy down?

A: The information was given to Chief Valendra, because it was in Martin, and he said he was going to conduct a follow-up investigation. So he would have been given that information.

Q: All right. So you didn't do anything more in that regard?

A: I don't recall if I did when I got back, other than told Chief Valendra.

Q: And just so we are clear, when you said, on direct, that she was in denial and misleading me at times, you were referring in part to this [D.H.] situation?

A: That, and also when we were discussing the panties, she initially told me that she didn't know anything about it and demanded that I tell her who made these allegations, and she turned around and told me that she has seen this green substances in the panties.

The court did not allow defendant to introduce this evidence, concluding that it would violate its previous ruling on third-party perpetrator evidence. However, the State was permitted to inquire into how Shanna was uncooperative during the investigation.

[¶20.] In holding to its ruling, the court also limited defendant's inquiry of Shanna and her concerns about D.H. Shanna had previously said that when Betty angrily questioned E.S.B. about the underwear there were concerns about her "running around" with D.H. This information, according to defendant, supported his theory that E.S.B. was motivated to blame defendant because she "was worried about her elders interfering with her relationship with a boyfriend[.]" Defendant believes that he should have been allowed to question E.S.B. about "whether or not

she was making the story up to deflect possible trouble at the time her elders questioned her about a stain in her panties." Allowing cross examination of the witnesses on this subject, defendant asserts, could establish a "justification for the victim to lie about the allegations, could give context to the statements of the alleged victim, and could show reasons other than sexual molestation for claims made."

[¶21.]     In response to these arguments, the State contends that the court properly excluded this evidence because there was nothing linking D.H. to the crimes charged and, therefore, the evidence was "highly unreliable" and of "little probative value." The State further asserts that the door was not opened during Sheriff Walker's testimony on why he believed Shanna was being uncooperative because Sheriff Walker had other reasons for finding her uncooperative. Regardless of whether the state opened the line of inquiry with its questions of Sheriff Walker, we think the court erred in restricting cross examination on the neighbor boy.

[¶22.]     At the outset, we must emphasize that there is no special rule in South Dakota dealing solely with third-party perpetrator evidence. Relevant evidence is admissible; irrelevant evidence is inadmissible, subject to the considerations of SDCL 19-12-3 (Rule 403). SDCL 19-12-2 (Rule 402). Labeling an offer "third-party perpetrator" evidence will not automatically exclude it. When third party perpetrator evidence is challenged as unfairly prejudicial, confusing, or misleading, trial courts are required to apply, on the record, the probative versus prejudicial balancing test of SDCL 19-12-3 (Rule 403) in deciding to admit or exclude such

evidence. *See* State v. Jenner, 451 NW2d 710, 722 (SD 1990); State v. Braddock, 452 NW2d 785, 789-90 (SD 1990).

[¶23.]    More to the point here, however, it must be recognized that there is a distinction between evidence offered to prove the guilt of another uncharged individual and evidence offered to show that a witness has a motivation to accuse the wrong person. To deny without rational basis evidence of the latter contravenes a defendant's due process rights. In *Davis v. Alaska*, the United States Supreme Court explained:

> A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.' 3 A J. Wigmore, Evidence § 940 at 775 (Chadbourn rev. 1970). We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.

415 US 308, 316-17, 94 SCt 1105, 1110, 39 LEd2d 347 (1974) (citing Greene v. McElroy, 360 US 474, 496, 79 SCt 1400, 1413, 3 LEd2d 1377 (1959)). "[D]ue process is in essence the right of a fair opportunity to defend against the accusations. State evidentiary rules may not be applied mechanically to defeat the ends of justice." State v. Luna, 378 NW2d 229, 233 (SD 1985) (citing Chambers v. Mississippi, 410 US 284, 93 SCt 1038, 35 LEd2d 297 (1973)); *see also* Holmes v. South Carolina, 547 US 319, 321, 126 SCt 1727, 1731-32, 164 LEd2d 503 (2006).

[¶24.]    We afford broad discretion to the court in deciding whether to admit or exclude evidence. *Steffen*, 2006 SD 41, ¶19, 713 NW2d at 621 (citations omitted).

However, "[w]hen a trial court misapplies a rule of evidence, as opposed to merely allowing or refusing questionable evidence, it abuses its discretion." State v. Guthrie, 2001 SD 61, ¶30, 627 NW2d 401, 415 (citing Koon v. United States, 518 US 81, 100, 116 SCt 2035, 2047, 135 LEd2d 392 (1996)). By considering the relevancy of defendant's proposed cross examination to his defense and then not weighing the probative value of this evidence against its prejudicial impact, the court misapplied SDCL 19-12-2 (Rule 402) and SDCL 19-12-3 (Rule 403). The court simply concluded that defendant was attempting to offer evidence of a third-party perpetrator and excluded any reference by defendant to D.H. for any purpose. Completely disregarded was defendant's interest in presenting his defense that E.S.B. was motivated to fabricate the allegations to avoid getting in trouble with Shanna and Betty.

[¶25.]     In *Chambers v. Mississippi*, the United States Supreme Court declared that "[t]he right of cross-examination is more than a desirable rule of trial procedure. It is implicit in the constitutional right of confrontation, and helps assure the 'accuracy of the truth-determining process.'" 410 US at 295, 93 SCt at 1046, 35 LEd2d 307 (quoting Dutton v. Evans, 400 US 74, 89, 91 SCt 210, 220, 27 LEd2d 213 (1970); Bruton v. United States, 391 US 123, 135-37, 88 SCt 1620, 1628-29, 20 LEd2d 476 (1968)). When a defendant's theory "is supported by law and . . . has some foundation in the evidence, however, tenuous[,]" the defendant has a right to present it. United States v. Grimes, 413 F2d 1376, 1378 (7thCir 1969) (citing Tatum v. United States, 190 F2d 612, 617 (DCCir 1951); United States v. Phillips, 217 F2d 435, 442-43 (7thCir 1954)); *see also* United States v. Chatham, 568 F2d

445, 450 (5thCir 1978); State v. Lujan, 967 P2d 123, 127 (Ariz 1998); Lewis v. State, 591 So2d 922, 925-26 (Fla 1991).

[¶26.]        Evidence tending to establish a motive of E.S.B. to fabricate the allegations against defendant was certainly relevant and probative, as it casts doubt on the State's evidence that defendant committed the crimes. *See* SDCL 19-12-1; *see* Olden v. Kentucky, 488 US 227, 231-32, 109 SCt 480, 483, 102 LEd2d 513 (1988). At the time E.S.B. implicated defendant, after Betty angrily questioned her in regard to a greenish stain in her underwear, Shanna and Betty had concerns about E.S.B. and the neighbor boy, D.H. E.S.B. did not make the accusations against defendant until the questioning from Betty and Shanna, which was about five months after the alleged touching. Allowing defendant an effective cross examination of Sheriff Walker, Shanna, Betty, and E.S.B. would not result in confusion of the issues, delay, waste of time, or presentation of cumulative evidence.

[¶27.]        An accused must "be afforded a meaningful opportunity to present a complete defense." State v. Iron Necklace, 430 NW2d 66, 75 (SD 1988) (citation omitted); *see also* State v. Mixon, 998 P2d 519, 523 (KanCtApp 2000) (citing State v. Bradley, 576 P2d 647 (Kan 1978)). Those denied the ability to respond to the prosecution's case against them are effectively deprived of a "'fundamental constitutional right to a fair opportunity to present a defense.'" State v. Lamont, 2001 SD 92, ¶16, 631 NW2d 603, 608-09 (quoting Crane v. Kentucky, 476 US 683, 687, 106 SCt 2142, 2145, 90 LEd2d 636 (1986)). By excluding all references to D.H., the court's ruling in all probability affected the final result and prejudiced defendant's right to a fair trial, requiring a new trial. *See* State v. Hage, 532 NW2d

406, 412 (SD 1995) (citing State v. Phillips, 489 NW2d 613, 617 (SD 1992); State v. Michalek, 407 NW2d 815, 818-19 (SD 1987)).

### 2. Jury Instruction

[¶28.]    Defendant next asserts that the court erred when it instructed the jury that defendant could be found guilty if the jury concluded that the alleged crime occurred "on or about" the dates alleged in the indictment.  According to defendant, the State agreed to limit the time frame to "on or between June 6-9, 2003."  When the State read the indictment to the jury, it recited "on or between June 6-9, 2003" and the court's preliminary jury instructions used "on or between June 6-9, 2003."  However, over defendant's objection, the court told the jury in its final instructions that even though the indictment charged "on or between," to find defendant guilty the evidence must establish "beyond a reasonable doubt that the offense was committed *on a date reasonably near the date alleged.*"[3]  (Emphasis added).

[¶29.]    Defendant argues that the court's "on a date reasonably near" instruction was improper.  He asserts that E.S.B. was at Betty's home while Shanna was in the hospital in Rapid City, which was from June 6 to at least June 9, 2003.  Therefore, because E.S.B. was not with him, defendant claims that the jury would not have found him guilty if the instruction used only the "on or between June 6-9, 2003," rather than "on a date reasonably near" the charged dates.

---

3.    Instruction 29 of the court's final instructions stated in its entirety:

> The indictment charges that the offense was committed "on or between" a certain date.  The proof need not establish with certainty the exact date of the offense alleged.  It is sufficient if the evidence

(continued . . .)

#24040

[¶30.]     When time is a material element of the crime or when time is of the essence, it may be error for a trial court to instruct the jury that a defendant can be found guilty if the jury finds that the crime occurred at a date reasonably near the date alleged. *See* State v. Sonen, 492 NW2d 303, 305 (SD 1992) (citing State v. Nelson, 310 NW2d 777, 779 (SD 1981)). Although defendant claims that E.S.B. was staying at Betty's when the alleged crimes occurred, there is also evidence that she stayed with defendant while Shanna was in the hospital. Shanna testified at trial that while she was in the hospital defendant was E.S.B.'s primary caretaker. Betty also testified that E.S.B. was with defendant. Therefore, defendant's "inverse alibi" defense is not sufficient in itself to make time of the essence. This is especially true considering that "in cases of sexual abuse of minors" we have held "that time is not a material element of the offense." *See* State v. Darby, 1996 SD 127, ¶10, 556 NW2d 311, 316 (citing State v. Floody, 481 NW2d 242, 247 (SD 1992); State v. Basker, 468 NW2d 413, 416 (SD 1991); State v. Wurtz, 436 NW2d 839, 842 (SD 1989); State v. Swallow, 350 NW2d 606, 608 (SD 1984)).

[¶31.]     Yet, in this case, there was a specific agreement between the State and the defense that the crime was committed "on or between June 6-9, 2003." Defendant relied on this agreement and defended the case in accordance with the time alleged. *See Sonen*, 492 NW2d at 306. Because of the agreement in this case, the court erred when it gave the jury the "on a date reasonably near" instruction.

_____

(. . . continued)
   establishes beyond a reasonable doubt that the offense was committed
   on a date reasonably near the date alleged.

This error substantially prejudiced defendant's rights.  *See Hage*, 532 NW2d at 412 (citing *Phillips*, 489 NW2d at 617; *Michalek*, 407 NW2d at 818-19).

### 3.  Sufficiency of the Evidence

[¶32.]    According to defendant, because the evidence at trial established through the testimony of Dr. Strong that the "genital opening" is the hymen, the State was required to establish that defendant penetrated E.S.B.'s hymen before the jury could find him guilty of rape.  Under SDCL 22-22-2, "[s]exual penetration means an act, however slight, of sexual intercourse . . . or any intrusion, however slight, of any part of the body or of any object into the genital or anal openings. . . ." We have never held that SDCL 22-22-2 requires hymenal penetration to constitute "an act, however slight, . . . into the genital" opening.  *See* SDCL 22-22-2.  When the State presents evidence of vulval or labial penetration, however slight, this act, if believed by the jury to have occurred, is sufficient to establish penetration of the genital opening.  *See* People v. Bristol, 320 NW2d 229, 230 (MichCtApp 1981); Jackson v. State, 452 So2d 438, 440-41 (Miss 1984); State v. Hirsch, 511 NW2d 69, 80 (Neb 1994).

### 4.  Investigating Officer's Testimony

[¶33.]    Over defendant's objection, the State asked Sheriff Walker, "During the thousands of investigations you've done in your 20-some years of law enforcement, have things changed from what you originally thought when you started the investigation, to when you completed it?"  The question was asked in relation to E.S.B.'s inconsistent statements.  Sheriff Walker responded:

> Witnesses can change their statements.  The dates can change. Perceptions that one individual has of seeing one thing, they

> may add to it or take away from it. Two individuals may see
> something differently. Any event in an investigation is subject
> to change. That is why you continue your investigation.

According to defendant, this "self-serving speculation, without foundation is in effect the officer's unqualified and bare expert opinion about how things routinely change to make the victim's inconsistent statements seem insignificant."

[¶34.] "[I]t is the function of the jury to resolve evidentiary conflicts, determine the credibility of witnesses, and weigh the evidence." State v. Svihl, 490 NW2d 269, 274 (SD 1992) (citing State v. Battest, 295 NW2d 739, 742 (SD 1980)). "The general rule . . . is that one witness may not testify [on the credibility of another witness] . . . because such testimony would invade the exclusive province of the jury to determine the credibility of a witness." McCafferty v. Solem, 449 NW2d 590, 592 (SD 1989), *overruled on other grounds*, State v. Raymond, 540 NW2d 407 (SD 1995).

[¶35.] Although we have allowed experts in sexual abuse cases to testify generally about child victims, Sheriff Walker was not offered as an expert on investigations involving child victims. *See* State v. McKinney, 2005 SD 73, ¶35, 699 NW2d 471, 482 (citing *Floody*, 481 NW2d at 249). However, even if the court erred in allowing this line of questioning, defendant has not argued that the court's error produced some effect on the outcome of the trial. *See Hage*, 532 NW2d at 412 (citing *Phillips*, 489 NW2d at 617; *Michalek*, 407 NW2d at 818-19). Instead, he claims that this error was prejudicial when considered with other trial errors. In light of the remand on the first issue, we need not determine if this error was prejudicial. *See* Shamburger v. Behrens, 380 NW2d 659, 664-65 (SD 1986).

### 5. Forensic Interviewer's Testimony

[¶36.]    Defendant next argues that the court improperly allowed Hawkins to testify about the credibility of E.S.B.  According to defendant, Hawkins's testimony was not general in regard to all child victims, but was specific to E.S.B. and, therefore, invaded the province of the jury.  The State asked Hawkins, "And so if I tell you that [E.S.B.]'s testimony was that, when she was here yesterday, was that this happened in her room.  And I think on the tape we saw it was in her mom's room. . . .  Does that cause you any great concern as someone who spends their career, 30 years, of working with children and doing forensic interviews?"  Over defendant's objection, Hawkins responded,

> I guess, had it been a radically different location, for instance, if she had said it happened in a car when she came and talked to the jury, or if she had said it happened out of doors, that would be a radically different environment, versus one bedroom in a home as another bedroom apparently in the same house?  That would not surprise me at all that *a child* would do that.  What we know about *children* talking about their abuse is that they tell things piece by piece, bit by bit, and much of that is based on what they feel is going to happen, once they tell all.

(Emphasis added).  According to defendant, "This is a far cry from talking about characteristics of abused children."

[¶37.]    "Generally, 'one witness may not testify as to another witness'[s] credibility or truth-telling capacity because such testimony would invade the exclusive province of the jury to determine the credibility of a witness.'" *McKinney*, 2005 SD 73, ¶32, 699 NW2d at 481 (quoting *Raymond*, 540 NW2d at 409-10 (citations omitted)).  However, an expert's testimony does not invade the province of the jury when it is a "generalized explanation of a child's capacity to testify[.]" *Id.*

¶33. We have also declined to find that an expert's testimony invaded the province of the jury when the expert testified "to the general characteristics of a sexually abused child." State v. Edelman, 1999 SD 52, ¶22, 593 NW2d 419, 423. Although the State's question was specific to E.S.B., and therefore improper, the response Hawkins gave was general and did not touch on E.S.B.'s credibility. Instead, she spoke about how this type of testimony would not surprise her based on her experience with children in general. Thus, although the objection to the prosecutor's question should have been sustained, the answer itself was not improper.

[¶38.]     Reversed and remanded.

[¶39.]     GILBERTSON, Chief Justice, and ZINTER and MEIERHENRY, Justices, concur.

[¶40.]     SABERS, Justice, concurs in part and dissents in part.


SABERS, Justice (concurring in part and dissenting in part).

[¶41.]     I concur in Issues 1, 2, 3 & 4. I dissent in Issue 5 because the Court improperly allowed forensic examiner Hawkins to testify about the credibility of E.S.B. As stated, her testimony was not *general* in regard to all child victims but *specific* to E.S.B. and invaded the province of the jury. *See McKinney*, 2005 SD 73, ¶¶32-36, 699 NW2d at 481.

[¶42.]     Even the majority opinion concedes that "the State's question was specific to E.S.B. and therefore improper . . . ." *Supra* ¶36. However, the majority opinion deludes itself into concluding that the response was general and did not

-20-

touch on E.S.B.'s credibility. I disagree. The State's question was specific as to E.S.B., was improper, and the answer to the specific question was responsive to the specific question. The State basically asked if there was a problem with E.S.B.'s credibility because she switched locations of the alleged abuse during her testimony. The forensic examiner improperly bolstered E.S.B.'s credibility when she essentially testified that she had no concern with the inconsistencies in E.S.B.'s testimony. Specifically, when responding to the improper question the forensic examiner explained:

> I guess, had it been a radically different location, for instance, if *she* had said it happened in a car when *she* came and talked to the jury, or if *she* had said it happened out of doors, that would be a radically different environment, versus one bedroom in a home as another bedroom apparently in the same house? That would not surprise me at all that *a child* would do that. What we know about *children* talking about their abuse is that they tell things piece by piece, bit by bit, and much of that is based on what they feel is going to happen, once they tell all.

*Supra* ¶35 (emphasis added). The majority opinion emphasizes the portions of the testimony which allegedly refer to children generally. However, the preceding statements specifically refer to "she." The forensic examiner's answer, taken as a whole, demonstrates that the jury could not have reasonably concluded that the response only went to the general characteristics of a sexually abused child. The response vouched for the credibility of the victim despite the fact that she was confused and incorrect about the room where the alleged incident occurred.

[¶43.] This case is going back for a re-trial. It would be a serious mistake if this Court puts its stamp of approval on an improper question which resulted in an

#24040

improper and prejudicial answer that bolstered E.S.B.'s credibility and invaded the

province of the jury.  This would be built in error for the next appeal and I dissent.