#30870-a-SPM
**2025 S.D. 45**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                     Plaintiff and Appellee,

    v.

SCOTT E. ANDERSON,                         Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
LAWRENCE COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE MICHELLE K. COMER
Judge

\* \* \* \*

SARA B. WAECKERLE
LORA A. WAECKERLE of
Waeckerle Law, Prof. LLC
Rapid City, South Dakota

RYAN W. WALNO of
Kinney Law, P.C.
Spearfish, South Dakota                    Attorneys for defendant and
                                           appellant.


MARTY J. JACKLEY
Attorney General

ERIN E. HANDKE
Assistant Attorney General
Pierre, South Dakota                       Attorneys for plaintiff and
                                           appellee.

\* \* \* \*

CONSIDERED ON BRIEFS
JUNE 2, 2025
OPINION FILED **8/13/25**

#30870

MYREN, Justice

[¶1.]	Law enforcement found Scott Anderson asleep in his vehicle at three o'clock in the morning and arrested him after conducting field sobriety tests. Anderson consented to provide blood and urine samples after being taken into custody. Chemists at the South Dakota Public Health Lab (state health lab) concluded that both samples contained tetrahydrocannabinol (THC), amphetamine, and methamphetamine. Anderson's defense was premised on concerns with the state health lab's test results. A jury convicted him, and he appeals the circuit court's judgment of conviction. We affirm.

## Factual and Procedural Background

[¶2.]	Officers Saul Torres and Hunter Bradley were patrolling in Spearfish in the early morning hours of May 18, 2023. As they drove past a storage facility, they noticed a vehicle sitting in the parking area with its brake lights illuminated. The officers approached the vehicle and found Anderson asleep in the driver's seat. When Officer Torres knocked on the window, Anderson woke up and the car began rolling forward. Anderson stopped the vehicle when the officers ordered him to do so. After conducting field sobriety tests, the officers arrested Anderson for driving under the influence. Anderson voluntarily provided urine and blood samples after being taken into custody. A field test of Anderson's urine produced presumptive positive results for THC, methamphetamine, and amphetamine. Officer Torres sealed the urine and blood samples, and they were sent to the state health lab for further testing.

[¶3.] The State filed an information charging Anderson with: (1) driving under the influence; (2) an alternative count for driving or being in physical control of a motor vehicle while under the influence; and (3) unauthorized ingestion of a controlled substance. Ultimately, a Lawrence County grand jury indicted Anderson for unauthorized ingestion of a controlled substance.

[¶4.] Irene Aplan, a forensic chemist at the state health lab, was responsible for testing Anderson's urine sample. Using gas chromatography mass spectrometry (GCMS), Aplan determined that Anderson's urine sample contained 166 nanograms per milliliter of carboxy THC; 6,684 nanograms per milliliter of amphetamine; and 23,008 nanograms per milliliter of methamphetamine. Jeremy Kroon, also a forensic chemist at the state health lab, was responsible for testing Anderson's blood sample through GCMS. Kroon documented that the blood sample contained 12 nanograms per milliliter of carboxy THC, 21 nanograms per milliliter of amphetamine, and 70 nanograms per milliliter of methamphetamine.

[¶5.] Anderson filed a motion requesting the circuit court to hold a hearing, pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to determine the qualifications of the chemists who tested Anderson's urine and blood samples and the reliability of the methods used. The State filed a written objection to this request and attached curricula vitae for Aplan and Kroon. The State noted that the decision to conduct a *Daubert* hearing was discretionary and contended that the chemists used accepted methods and were qualified to perform the tests.

[¶6.] At the hearing on Anderson's motion, he pointed out that there are different isomers of methamphetamine—d-isomer methamphetamine and l-isomer

methamphetamine. Anderson asserted that l-isomer methamphetamine is an ingredient in several over-the-counter products and that the testing methodologies used by the state health lab do not distinguish between the two isomers. Anderson argued that because the State's testing did not differentiate between the two isomers, the State could not prove which isomer he consumed. Anderson also argued that the margin of error at the state health lab was +/- 20% and that this figure called into question the test's reliability.

[¶7.]     The circuit court denied Anderson's request for a *Daubert* hearing, reasoning that it had "latitude in determining how to test an expert's reliability[.]" The circuit court determined that Aplan and Kroon's testimony was relevant and that there was "adequate empirical proof of validity or theory of the method." Accordingly, it concluded that there was no need to conduct a *Daubert* hearing.

[¶8.]     During a pretrial hearing, the circuit court ordered Anderson and the State to disclose their witnesses and exhibits and set a deadline for those disclosures. As ordered by the circuit court, the parties exchanged witness and exhibit lists before trial. Anderson identified two witnesses he intended to call at the trial—Valeri Silva and Stacy Ellwanger. Silva is a pharmacist, and Anderson intended to call her as an expert witness to "testify as to all over-the-counter medications and drugs sold at the Walmart Pharmacy that contain L-Methamphetamine." Ellwanger is the Deputy Director at the state health lab.

[¶9.]     On the Friday before the trial was set to begin and after the witness disclosure deadline, Anderson's counsel identified Sarah Urfer, a forensic toxicologist, as an "expert rebuttal witness" and supplied a report she had prepared.

In her report, Urfer concluded, "[T]here are several issues involved with the testing by the South Dakota Department of Health that give me concerns with regard to the validity and reliability of the results." Urfer utilized *Kreps v. Dependable Sanitation, Inc.*, 21-CV-04118, 2022 WL 4094124 (D.S.D. Sept. 7, 2022), to guide her analysis. Urfer found the +/- 20% margin of error that was discussed in the *Kreps* opinion to be particularly concerning. Urfer noted that she was unable to determine the margin of error associated with the testing of Anderson's samples because the state health lab's reports did not disclose that information. Additionally, Urfer found it "extremely concerning" that the state health lab did not distinguish between the isomers of methamphetamine.

[¶10.] The State filed a motion in limine requesting that Anderson and his witnesses be prohibited from making any "reference to 'l-methamphetamine,' 'levmethamphetamine,' or any other scientific name for this molecule." The State explained that it had not received any information that suggested that Anderson had consumed any over-the-counter medications containing l-methamphetamine around the time he was charged with the underlying offenses.

[¶11.] The circuit court heard arguments relating to the State's motion on the first morning of the jury trial. The State argued that because there was nothing in the record suggesting that Anderson had consumed any product that contained l-methamphetamine during the pertinent timeframe, it could confuse or mislead the jurors to allow Anderson to provide evidence to differentiate between the two isomers. In response, Anderson argued that the difference between l-methamphetamine and d-methamphetamine was the crux of his defense and that

-4-

prohibiting him from mentioning the difference would violate his right to have a fair trial. Anderson's counsel represented that one of the defense witnesses would "testify to Mr. Anderson's allergies." Anderson asserted that the testing performed by the state health lab should be excluded because it was unreliable and did not differentiate between the two isomers.

[¶12.] The circuit court acknowledged Anderson's intended defensive theory and stated that he could present evidence about any substance he had taken during the relevant time. The circuit court then explained that the Legislature classified methamphetamine and its isomers as a Schedule II substance in SDCL 34-20B-16 and had not excepted l-methamphetamine from that classification. The circuit court precluded Anderson from presenting testimony about the different isomers of methamphetamine. Finally, the circuit court prohibited Anderson from introducing Urfer's testimony because his disclosure of her as an expert witness was untimely.

[¶13.] At trial, the State called Officers Torres and Bradley, chemists Aplan and Kroon, and Suzanne Ryan (the phlebotomist who conducted the blood draw). During the State's redirect examination of Aplan, she mentioned that l-methamphetamine is an ingredient in some over-the-counter medications. Thereafter, the circuit court allowed Anderson to ask questions about the difference between l-methamphetamine and d-methamphetamine.

[¶14.] In his case-in-chief, Anderson called Ellwanger and asked her about the practices at the state health lab. Anderson also called Silva, an expert in pharmacology, but the circuit court ruled that her expertise did not extend to the margins of error for testing labs like the state health lab.

[¶15.] The jury found Anderson guilty of unauthorized ingestion of a controlled substance and driving or being in physical control of a motor vehicle while under the influence. The jury found Anderson not guilty of the alternative count of driving under the influence. Anderson appeals, raising three issues: (1) Whether the circuit court abused its discretion when it prohibited Anderson from calling Urfer as a witness and when it limited Silva's testimony; (2) Whether the circuit court abused its discretion when it declined to conduct a *Daubert* hearing; and (3) Whether the circuit court denied Anderson of his right to a fair trial.

## Decision

### 1. Whether the circuit court abused its discretion when it prohibited Anderson from calling Urfer as a witness and when it limited Silva's testimony.

[¶16.] "[T]he trial court has broad discretion in determining the qualifications of expert witnesses and in admitting expert testimony." *State v. Machmuller*, 2001 S.D. 82, ¶ 14, 630 N.W.2d 495, 499 (alteration in original) (quoting *State v. Edelman*, 1999 S.D. 52, ¶ 38, 593 N.W.2d 419, 425). This Court has "defined abuse of discretion as 'discretion exercised to an end or purpose not justified by, and clearly against, reason and evidence.'" *State v. Carter*, 2023 S.D. 67, ¶ 24, 1 N.W.3d 674, 685 (quoting *State v. Snodgrass*, 2020 S.D. 66, ¶ 25, 951 N.W.2d 792, 802).

[¶17.] "To establish reversible error with regards to an evidentiary ruling, 'a defendant must prove not only that the trial court abused its discretion in admitting [or excluding] the evidence, but also that the admission resulted in prejudice.'" *Id.* (quoting *State v. Loeschke*, 2022 S.D. 56, ¶ 46, 980 N.W.2d 266, 280). To establish prejudice, it must be shown that there is "a reasonable probability that, but for [the

error], the result of the proceeding would have been different." *Id.* ¶ 26, 1 N.W.3d at 686 (alteration in original) (quoting *Owens v. Russell*, 2007 S.D. 3, ¶ 9, 726 N.W.2d 610, 615).

### A. Urfer's Testimony

[¶18.] Anderson contends that Urfer was retained "in anticipation of rebutting the State's position that the laboratory was reliable."[1] The circuit court excluded Urfer's testimony, not on the grounds that she was unqualified, but because Anderson's disclosure was untimely. Anderson argues that Urfer was a rebuttal witness, and he had no obligation to disclose her existence.[2]

[¶19.] At a pretrial hearing eleven days before the trial began, the circuit court ordered that Anderson and the State disclose which witnesses and exhibits they intended to present and set a deadline for those disclosures. After that

---

1. SDCL 22-42-5.1 is the statute that criminalizes the unauthorized ingestion of a controlled substance. Under this statute, the State must prove the defendant "knowingly" ingested a controlled drug or substance. Anderson's defensive theory was that it was not illegal for him to consume a substance that he knew contained l-methamphetamine. Anderson did not advance any argument that he had unknowingly consumed a substance that contained l-methamphetamine.

2. Anderson's claim that he did not need to disclose Urfer as an expert witness because she would be a "rebuttal witness" is misplaced. Although this Court noted in *Schrader v. Tjarks*, 522 N.W.2d 205, 209 (S.D. 1994), that "[n]either statute or rules, nor South Dakota precedent require[s] disclosure of rebuttal witnesses," we were referring to "rebuttal" evidence as referenced in SDCL 15-14-1. This court rule sets forth the order of trial proceedings, starting with the presentation of evidence by the party having the burden of proof, followed by the opposing party's evidence. SDCL 15-14-1(4) to (5). It further provides that "[t]he party having the burden of proof may then offer *rebutting* evidence only, and the opposing party may also offer *rebutting* evidence only[.]" SDCL 15-14-1(6) (emphasis added). Here, Anderson proposed to elicit testimony on the reliability of the State's test results from Urfer in his case-in-chief.

deadline had expired, Anderson disclosed Urfer as an expert witness and attached her report. Because the disclosure was untimely, the circuit court precluded Urfer's testimony.

[¶20.] "Criminal defendants have a fundamental right to present the testimony of witnesses in their defense." *United States v. Watkins*, 66 F.4th 1179, 1184 (8th Cir. 2023) (citation omitted); *see also State v. Guzman*, 2022 S.D. 70, ¶ 27, 982 N.W.2d 875, 886 (explaining that "[t]he right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense" (alteration in original) (citation omitted)). "However, there is no absolute right for criminal defendants to call every witness." *Watkins*, 66 F.4th at 1184 (citation omitted). "A defendant's right to present witness testimony is limited by 'other legitimate interests in the criminal trial process.'" *Id.* (citation omitted).

[¶21.] Here, the circuit court set a deadline for the disclosure of all witnesses and exhibits and ordered the parties to comply. The circuit court had the authority to enter its disclosure order under SDCL 23A-45-13, which provides: "If no procedure is specifically prescribed by statute or rule, a court may proceed in any lawful manner not inconsistent with [SDCL Title 23A] or with any other applicable statute." Anderson intended to call Urfer during his case-in-chief, but he failed to comply with the circuit court's pretrial order requiring the disclosure of witnesses. Consequently, it was within the circuit court's discretion to exclude her testimony.

### B. *Silva's Testimony*

[¶22.]     After Anderson disclosed that he intended to call Silva as an expert witness at trial, the State objected. Silva has a Bachelor of Science in Pharmacy and has worked as a retail pharmacist for 33 years. Anderson retained her as an expert to "testify as to all over-the-counter medications and drugs sold at the Walmart Pharmacy that contain L-Methamphetamine[,]" and to "provide data regarding a list of over-the-counter drugs containing L-Methamphetamine." After an offer of proof, the circuit court allowed Silva to testify as to the different isomers of methamphetamine and about cold medications that contain l-methamphetamine.

[¶23.]     During Anderson's redirect examination of Silva, he asked, "Okay. Is a 20% margin of error appropriate in your field?" The State objected. After an offer of proof made outside the presence of the jury, the circuit court determined that Silva could not testify about the state health lab's margin of error:

> The Court finds it to be irrelevant and not admissible to the fact at issue in the case. And the Court finds that the testimony of the experts that testified – or, tested the drug specified what the error rate meant and Ms. Silva is not in that testing capacity nor does she have experience with testing, blood testing or urine testing or forensic testing. With all due respect, she is an expert in her area but not in that area.

Anderson argues the circuit court's limitation on Silva's testimony was an abuse of discretion.

[¶24.]     This Court determines the admissibility of expert testimony in accordance with the standard announced in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *State v. Jackson*, 2020 S.D. 53, ¶ 43, 949 N.W.2d 395, 408. "Whether a witness is qualified as an expert can only be

determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *State v. Lemler*, 2009 S.D. 86, ¶ 18, 774 N.W.2d 272, 278 (citation omitted).

[¶25.] Anderson retained Silva to testify about the different isomers of methamphetamine and cold medications that contain l-methamphetamine. Based on her education and experience, the circuit court recognized her as an expert capable of testifying about those retail drugs that contain l-methamphetamine. However, nothing in Silva's testimony established how her expertise in the field of pharmacy equated to expertise regarding the margin of error in the testing at the state health lab. Although Silva testified that she took statistics courses to receive her degree in pharmacy, this alone could not qualify her to provide an opinion regarding the state health lab's margin of error.

[¶26.] Equally important, Anderson's "margin of error" argument lacks critical context. As Aplan, Kroon, and Ellwanger testified, the reported +/- 20% margin of error has a specific meaning—that there is a 20% range in the reported *amount* of a substance found, not that there is a 20% chance that the test result incorrectly identified the *presence* of a substance. Silva did not demonstrate any familiarity with this metric. The circuit court did not abuse its discretion when it limited Silva's testimony to the areas of her demonstrated expertise.

### 2. *Whether the circuit court abused its discretion when it declined to conduct a Daubert hearing.*

[¶27.] Anderson filed a pretrial motion requesting a *Daubert* hearing to gauge the reliability of the testing methods at the state health lab and the testing performed by Aplan and Kroon. The circuit court denied Anderson's request for a

*Daubert* hearing. It concluded that the chemists' testimony was relevant and that there was "adequate empirical proof of validity or theory of the method" used by Aplan, Kroon, and the state health lab. It reasoned, "the challenged evidence does not present a new scientific theory and the methodologies are usual and customary." Moreover, the circuit court noted there was no evidence the chemists improperly applied those methods when they tested Anderson's urine and blood. Anderson argues the circuit court abused its discretion when it denied his request for a *Daubert* hearing.

[¶28.] "The purpose of a *Daubert* hearing is to determine whether the offered 'expert testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Burley v. Kytec Innovative Sports Equip., Inc.*, 2007 S.D. 82, ¶ 25, 737 N.W.2d 397, 406 (quoting *Daubert*, 509 U.S. at 597). "The trial court . . . [has] latitude in deciding *how* to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability[.]" *Kumho Tire Co., v. Carmichael*, 526 U.S. 137, 152 (1999). To that end, "[t]here is no requirement that the [circuit court] always hold a *Daubert* hearing prior to qualifying an expert witness." *United States v. Kenyon*, 481 F.3d 1054, 1061 (8th Cir. 2007) (first alteration in original) (citation omitted); *see also State v. Moeller*, 2000 S.D. 122, ¶¶ 86–88, 616 N.W.2d 424, 449 (concluding the circuit court did not abuse its discretion when it denied a request for a *Daubert* hearing). "When a [circuit] court is satisfied with an expert's education, training, and experience, and the expert's testimony is reasonably based on that education, training, and

experience, the court does not abuse its discretion by admitting the testimony without a preliminary hearing." *Kenyon*, 481 F.3d at 1061 (citation omitted).

[¶29.]        However, when expert testimony is the product of new scientific theories or is based on complex or unusual methodologies, a *Daubert* hearing is appropriate. *Moeller*, 2000 S.D. 122, ¶ 86, 616 N.W.2d at 449 (citation omitted). Additionally, a *Daubert* hearing is appropriate when there is evidence that an expert's analysis was "skewed as to alter the otherwise reliable scientific method" used by the expert. *Id.* ¶ 87 (citation omitted).

[¶30.]        The circuit court had access to the curricula vitae of Aplan and Kroon and was therefore familiar with their qualifications to conduct GCMS analysis of test samples. Gas chromatography is a well-known and widely used method of analyzing substances. *Bullcoming v. New Mexico*, 564 U.S. 647, 654 n.1 (2011) ("Gas chromatography is a widely used scientific method of quantitatively analyzing the constituents of a mixture."). The circuit court was not confronted with any new methodology or technique when it considered whether a *Daubert* hearing was appropriate under the circumstances. The circuit court did not abuse its discretion when it denied Anderson's request for a *Daubert* hearing.

### 3.    *Whether the circuit court denied Anderson his right to a fair trial.*

[¶31.]        Anderson argues that the deficiencies he perceives with the testing performed at the state health lab, the circuit court's refusal of Urfer's testimony, and its limitation on Silva's testimony denied him his constitutional right to a fair trial. He contends the circuit court's handling of these issues prohibited him from mounting a meaningful defense. This Court analyzes whether a defendant was

denied a fair trial de novo. *See Guzman*, 2022 S.D. 70, ¶ 30, 982 N.W.2d at 887 (citation omitted).

[¶32.]     "[A]n accused must be afforded a meaningful opportunity to present a complete defense. When the defendant's theory is supported by the law and . . . has some foundation in the evidence, however tenuous, the defendant has a right to present it." *State v. Birdshead*, 2015 S.D. 77, ¶ 27, 871 N.W.2d 62, 73 (alterations in original) (citation omitted). Stated differently, "[d]ue process is in essence the right of a fair opportunity to defend against the accusations." *State v. Packed*, 2007 S.D. 75, ¶ 23, 736 N.W.2d 851, 859 (citation omitted).

[¶33.]     Anderson's defense theory was premised on an incorrect belief that it was legal to possess or consume the l-methamphetamine isomer of methamphetamine. Under SDCL 34-20B-16(6), methamphetamine is classified as a Schedule II substance. SDCL 34-20B-16 also provides: "Any of the following substances, including their . . . isomers, and salts of isomers, is included in Schedule II except those narcotic drugs listed in other schedules[.]" Accordingly, the Legislature has classified all isomers of methamphetamine as a Schedule II substance. The circuit court denied Anderson's requested jury instruction stating that d-methamphetamine is a controlled substance, but l-methamphetamine is not.[3]

[¶34.]     Even though Anderson's defense was based on the faulty premise that the State needed to prove which isomer of methamphetamine he had in his blood and urine, he was allowed, through examination and cross-examination, to place before the jury a substantial amount of information related to his theory of the case.

---

3.     Anderson has not appealed this ruling by the circuit court.

#30870

Our de novo review of this record reveals that Anderson received a fair trial and was not denied his right to present a complete defense.  We affirm.

[¶35.]     JENSEN, Chief Justice, and KERN, SALTER, and DEVANEY, Justices, concur.