#29722-a-PJD
**2022 S.D. 70**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

THEODORE GUZMAN,                    Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE ROBERT A. MANDEL
Judge

\* \* \* \*

CONOR DUFFY of
Duffy Law Firm
Rapid City, South Dakota                    Attorneys for defendant
                                  and appellant.


MARK VARGO
Attorney General

CHELSEA WENZEL
Assistant Attorney General
Pierre, South Dakota                    Attorneys for plaintiff
                                  and appellee.

\* \* \* \*

ARGUED
MAY 25, 2022
OPINION FILED **11/16/22**

#29722

DEVANEY, Justice

[¶1.]        Theodore Guzman appeals his convictions of first-degree rape and sexual contact stemming from incidents involving two of his children and one of his children's friends.  Guzman asserts that the circuit court erred by excluding witness testimony and evidence offered in his case-in-chief; by allowing the State to admit a trial transcript of his testimony from his first trial; by allowing the State to admit other act evidence and expert testimony; and by ordering him to pay certain costs of prosecution.  We affirm.

## Factual and Procedural Background

[¶2.]        Guzman has eight children, including five biological children, two stepchildren, and one adopted child.  Only three of the children are relevant to this appeal: N.G., A.G., and L.G.  This appeal also concerns N.G.'s friend, A.C.  The Guzman family and A.C.'s family had been friends for years, and in the summer of 2017, Guzman, his three children, his girlfriend, and her child lived with A.C.'s family.  In November 2017, the timeframe during which Guzman allegedly raped A.C., Guzman was residing in his parents' home with his parents, his sister and her two children, his brother and his brother's partner, two other adult males, and Guzman's three children at issue.

[¶3.]        On the November 2017 evening in question, 12-year-old A.C. and her younger siblings stayed the night with N.G. and L.G. at the Guzman home.  A.C. explained that on the evening of the sleepover, Guzman allowed her and N.G. to drive his vehicle by taking turns sitting on his lap and steering the vehicle.  When Guzman and the girls returned to the Guzman home, he asked A.C. and N.G. to

-1-

help him with the laundry. The laundry room was in the basement. While they were in the laundry room, Guzman asked N.G. to go upstairs and grab something. N.G. complied, leaving Guzman alone with A.C. Guzman then kneeled in front of A.C. and asked her if he could see her private parts. Although she was scared, A.C. replied "no" and "giggled it off."

[¶4.]     Later that evening, N.G. slept on the couch in the living room while A.C. and the other children slept on the floor. It was typical for the children, and also Guzman, to sleep in the living room because Guzman's parents, his sister, and an adult male occupied the three upstairs bedrooms. The other adults usually slept in the basement. On the night of A.C.'s rape, Guzman slept in the living room with the children. When Guzman laid down next to A.C., N.G. asked A.C. whether she wanted to sleep on the couch with her. A.C. remained on the floor, explaining there was not enough room on the couch for both her and N.G.

[¶5.]     While Guzman was on the floor next to A.C., he showed her photos on his phone of girls' butts and told A.C. not to tell her mom about the photos. A.C. later woke up to Guzman pulling down her pants. A.C. told Guzman to stop, but he proceeded to rub her butt with his penis. A.C. was able to get her pants back up and go back to sleep, but she was awakened two more times by Guzman trying to pull her pants down. While she tried to get away from him the second time, Guzman "bopped" her on her head, and after he finally succeeded in exposing her butt, he inserted his penis. A.C. described how this hurt and "just burned." After being penetrated, A.C. crawled down to the feet area of where the others were

sleeping and curled up into a ball. She stated that she was crying, and Guzman tried to comfort her by rubbing her back until she fell asleep again.

[¶6.] The following morning, Guzman told A.C. not to tell anyone because his kids needed him. He then drove A.C. and the other children back to A.C.'s house. When they got there, N.G. followed A.C. into her bedroom and said, "I know what's going on. He's doing it to me too." A.C. did not want to discuss the incident and instead acted as though nothing had happened.

[¶7.] A.C. did not immediately disclose the rape because she was scared. In the time that followed the sleepover, A.C.'s parents described her as "kind of angry and standoffish." A couple weeks after the sleepover, A.C. was following her mom around the house and pacing back and forth. At some point, she finally told her mother that she needed to tell her something. A.C. then stated, "Mom, he did it." A.C.'s mom asked her who and what she was referring to, and A.C. told her that Guzman had sex with her. A.C. then began crying. After comforting A.C., her mom called the police and the officer who arrived advised A.C.'s mom not to ask her any more questions. A.C.'s mom then took her to the emergency room to be examined. A.C. tested negative for sexually transmitted infections and was referred to the pediatrics department for a physical examination. On December 11, 2017, Tifanie Petro, a forensic interviewer at the Children's Home Child Advocacy Center, completed an interview with A.C. during which A.C. disclosed the details of what had happened with Guzman.

[¶8.] Following A.C.'s disclosure, Guzman's children were removed from his care by the Department of Social Services (DSS) on December 13, 2017. Guzman's

nine-year-old son, A.G., was placed in a foster home separate from his sisters, ten-year-old N.G. and eight-year-old L.G., who were placed in a foster home for girls. Given N.G.'s statement to A.C. the morning after A.C.'s rape, Petro conducted a forensic interview with N.G. While N.G. did not disclose any sexual abuse in that interview, around Christmas of 2017, she told her foster mom that Guzman had sexually abused her. N.G. claimed she had lied about the sexual abuse in the first interview because she was scared and thought that her dad would "go away for a long time." Petro interviewed N.G. again on January 5, 2018. This time N.G. disclosed multiple instances of sexual abuse by Guzman.

[¶9.]	In describing the abuse, N.G. first related that Guzman had shown her a pornography website on his phone and told her to watch it. N.G. then explained one incident of sexual abuse that occurred when she and Guzman were driving to the store. Guzman had pulled down his pants in the vehicle and placed her hand on his penis, forcing her to stroke it. Another incident occurred while living at Guzman's parents' home. N.G. was lying on her aunt's bed when Guzman entered the room and got into bed with her. Both N.G. and Guzman were under the covers, and N.G.'s back was facing Guzman's stomach. Although N.G. attempted to keep her pants on, Guzman pulled her pants down and began touching her vagina with his penis.[1] While this was occurring, L.G. entered the room to get items out of the closet. Guzman penetrated N.G.'s vagina, causing her to say "ow." L.G. turned to look at N.G., but N.G. remained quiet because Guzman had told her to "shut up"

---

1.	N.G. told Petro during her forensic interview that she started wearing belts, which she cinched so tight that they left marks on her skin, to try and prevent Guzman from being able to pull her pants down.

and because she did not want L.G. to know what had happened. L.G. then left the room. Guzman later told N.G. that she was "filling in for his girlfriend."

[¶10.] In July 2018, L.G. told her foster mom and N.G. that Guzman had previously raped her. Petro conducted a forensic interview with L.G. during which L.G. disclosed one incident of sexual abuse. L.G. was approximately six years old when the abuse occurred and was living at her aunt's (Guzman's sister's) house with her siblings and Guzman. At this house, the children and Guzman slept in the living room together. One night while L.G. was sleeping next to Guzman with her back facing his stomach, L.G. woke to Guzman putting his penis in her "back spot" which she described as the part used for "pooping." L.G. explained that he put it in and out multiple times. She also explained that she was scared and did not know what to do, but she remembers waking up one of her sisters to go to the bathroom with her and telling her what had happened. L.G. could not recall which sister she spoke to, but she explained that this sister took her back to the other side of the floor where that sister had been sleeping.

[¶11.] Guzman was initially indicted by a Pennington County grand jury in March 2018 on one count of first-degree rape of A.C. In August 2018, the grand jury issued a superseding indictment adding two counts of first-degree rape (one pertaining to acts with N.G. and the other with L.G.) and one count of sexual contact with N.G. Guzman's first jury trial occurred in January 2020. Prior to trial, Guzman filed a motion in limine to preclude the State from eliciting duplicitous evidence. The State acknowledged duplicitous evidence is often an issue in sexual abuse cases due to the repetitive and pervasive nature of the alleged

abuse that can occur. Upon the circuit court's suggestion, the State drafted a proposed jury instruction that would explain to the jurors that they must unanimously agree on the acts supporting each charge, and in its opening statement, the State referenced only two instances of sexual abuse pertaining to N.G. However, during the trial, N.G. testified to an additional instance of abuse beyond the two instances charged.[2] Guzman objected, raising his concern regarding duplicitous evidence. After a discussion between the court and counsel outside the presence of the jury regarding the nature of N.G.'s testimony, Guzman withdrew his objection, obviating the need for a ruling on the matter. The circuit court did, however, provide the jury a unanimity instruction at the close of trial.

[¶12.]     Aside from N.G.'s testimony, the State presented testimony from A.C., her parents, L.G., Petro and Brandi Tonkel from the Child Advocacy Center, and numerous law enforcement and medical professionals. Through Petro, the State introduced video recordings of the three girls' forensic interviews. Tonkel testified about forensic interviewing techniques and protocols, the dynamics of child sexual abuse disclosures, and the trauma associated with sexual abuse. After the State rested, Guzman testified, waiving his Fifth Amendment right against self-incrimination. Although he maintained a general denial as to all alleged claims of sexual abuse, he did confirm that A.C. had spent the night at his parents' home in November 2017, and that he let A.C. sit on his lap and steer his vehicle that

---

2.     In her forensic interview, the video of which was admitted at trial and played for the jury, N.G. indicated she was subjected to sexual abuse throughout her childhood. She generally described how Guzman "always tried to do it to me" and provided details on a few instances.

evening. But he testified that he left the home that night prior to the girls going to sleep and that he did not return until the next morning when they were up making pancakes, after which he drove them back to A.C.'s home.

[¶13.] Guzman called his mother, Helen Guzman, as one of the defense witnesses. Helen testified that A.C. spent the night at her home only one time in "early summer" before school started in August, a timeframe that was not consistent with Guzman's testimony regarding when the sleepover occurred. Helen stated that on the night of the sleepover, Guzman brought A.C. to the house but left sometime later. She explained that she was awake until 2:30 a.m. and that the girls were asleep in the living room when she went to sleep in her bedroom. She claimed that she slept with her door open and that she did not wake up until 10:00 a.m. According to Helen, by the time she woke, Guzman had already taken the girls back to A.C.'s house. When asked on cross-examination whether she had any "direct knowledge of what happened that night in the living room[,]" Helen did not answer this question; she instead responded that her daughter Nichole (who also testified for the defense) was home that evening and that "[n]othing happened." After the case was submitted to the jury, the jurors were unable to return a verdict and the circuit court therefore declared a mistrial.

[¶14.] Guzman's second trial began in April 2021. Prior to trial, Guzman filed a notice of intent to offer the recorded forensic interview of Guzman's son A.G. in which A.G. disclosed that he had been raped by a male neighbor. Guzman argued that the interview was relevant to show children's "propensity to fabricate events and allegations[.]" He requested that the recording be admitted through

Petro in his case-in-chief or, alternatively, used to impeach Petro on cross-examination to show "how she has elicited false accusations by a member of the same family during the same time period." The State objected to the use of A.G.'s forensic interviews, asserting that the interviews were irrelevant because A.G. was not a victim in the case at hand, that A.G.'s rape allegation was not against Guzman, and that there was no evidence indicating that A.G.'s disclosures were false.[3]

[¶15.] Following counsels' arguments, the circuit court concluded that the video recording of A.G.'s rape allegation was irrelevant and thus inadmissible. However, as to "whether or not it can be raised in cross-examination," the court directed that this issue must be "raised outside the presence of the jury first[.]" The court further noted that it would consider whether to allow such cross-examination "depending upon factually what we have at that point and what the intent is." While cross-examining Petro at trial, Guzman did not ask the court to allow him to refer to A.G.'s allegations of sexual misconduct.

---

3. After Guzman filed his notice of intent to offer a recording of a forensic interview with A.G., two forensic interview recordings were provided to the circuit court for an in-camera review. One involved the alleged rape of A.G. by the male neighbor, and the other pertained to allegations of sexual conduct with A.G. initiated by two neighbor girls and reported by others witnessing part of this event. Counsel for both the State and Guzman referred to both recordings when later presenting arguments to the circuit court on the admissibility or use of this evidence for cross-examination purposes, and the State refers to the recordings (plural) in its arguments on appeal. However, because Guzman's arguments on appeal refer only to A.G.'s rape allegation, we address only the forensic interview recording pertaining to this incident.

[¶16.]    Prior to the second trial, the circuit court also addressed Guzman's objection to the cumulative nature of proffered testimony by Hollie Strand, a witness the State had substituted for Brandi Tonkel to provide similar testimony to that offered by Tonkel at the first trial. Similar to its ruling denying Guzman's objection to the cumulative nature of Tonkel's testimony made prior to the first trial, the circuit court declined to exclude Strand's testimony. However, the court advised counsel that it would not preclude Guzman from raising at trial the issue of whether any of the testimony was cumulative. At trial, Guzman again objected to Strand's testimony, but he did not assert that it was cumulative; he objected on other grounds not at issue in this appeal. The court overruled his objection.

[¶17.]    During the State's case-in-chief, the State notified the circuit court and defense counsel that it intended to offer Guzman's testimony from his first trial either by reading the trial transcript into the record or by offering the transcript as an exhibit. Guzman objected, claiming, in part, that he took the stand to rebut the State's introduction of duplicitous evidence. The court denied the objection and allowed the transcript to be read into the record. Guzman chose not to testify on his own behalf at the second trial.

[¶18.]    Also at the second trial, the State proffered testimony from W.B., a friend of one of Guzman's other daughters, who claimed to have been sexually abused by Guzman on multiple occasions during sleepovers with Guzman's children when she was a minor. The State argued that her testimony was admissible under Rule 404(b) to show motive, opportunity, intent, absence of mistake or accident, and common plan or scheme. Guzman objected, asserting the testimony was offered

-9-

merely to show propensity and that it was more prejudicial than probative under Rule 403 and should therefore be excluded. The circuit court permitted W.B. to testify, concluding her testimony went to "intent, preparation, plan, [and] absence of mistake." The court also concluded that the testimony would not "prejudice the jury in an unfair or illegitimate manner."

[¶19.] Shortly before the State rested, the State asked that Helen, who was included on Guzman's list of potential witnesses, and her husband Benny be precluded from testifying on behalf of Guzman because they had violated the sequestration order by watching the trial via livestreaming in a viewing room separate from the courtroom. In response, Guzman's counsel stated that he "talked to them a couple of nights ago. It did seem like they had popped into that room." However, he requested that they be permitted to testify because they were "relevant rebuttal witnesses" and their testimony would be limited to the events on the evening A.C. was allegedly raped in their home.

[¶20.] In considering whether Helen and Benny had violated the sequestration order, the circuit court heard testimony from Jamie Fisher, a paralegal in the Pennington County State's Attorney's Office, who stated that he had observed about "98 percent" of the trial and that he saw Benny in the viewing room during the first week of trial and during L.G.'s testimony the day prior. Fisher testified he only remembered seeing Helen in the viewing room during L.G.'s testimony. The circuit court excluded both Helen's and Benny's testimony because they violated the sequestration order.

[¶21.]		On April 15, 2021, the jury found Guzman guilty on all counts, and the circuit court sentenced Guzman to life imprisonment on each of the three counts of first-degree rape and fifteen years on the sexual contact count, all to run consecutively.  Prior to sentencing, the State requested that Guzman pay for the "expenses incurred during the pendency of this case[,]" including expert witness fees.  Guzman objected, arguing that expert fees are excluded under SDCL 23A-27-26.  The circuit court disagreed and ordered him to pay Pennington County $13,390.66 for the costs of prosecution, which included the State's expert witness fees.

[¶22.]		Guzman appeals, raising the following restated issues:

1.	Whether the circuit court erred by excluding Helen Guzman's testimony.

2.	Whether the circuit court erred by admitting Guzman's testimony from his first trial.

3.	Whether the circuit court abused its discretion by admitting W.B.'s testimony.

4.	Whether, under plain error review, the circuit court erred by admitting Hollie Strand's testimony.

5.	Whether the circuit court abused its discretion by excluding A.G.'s forensic interview.

6.	Whether the circuit court abused its discretion by ordering Guzman to reimburse Pennington County for expert witness fees.

## Analysis and Decision

### 1. Whether the circuit court erred by excluding Helen Guzman's testimony.

[¶23.]     On appeal, Guzman first asserts that the circuit court erred in excluding Helen's testimony because the court had not entered a sequestration order for the second trial. While it is undisputed that a reciprocal sequestration order was entered prior to Guzman's first trial, there is no indication in the record that the parties renewed their motion for witness sequestration prior to the second trial or that the court entered another sequestration order. However, it is clear from the record that when presenting arguments to the court on the exclusion of Helen and Benny as witnesses, both parties believed there was still a sequestration order governing the second trial. Both parties also made requests to the court during the trial to accommodate other witnesses based on the assumption that the sequestration order was still in place. Therefore, we reject Guzman's newly asserted suggestion otherwise.

[¶24.]     Guzman further asserts that error occurred because, in his view, the circuit court's exclusion of Helen's testimony violated his right to due process and his Sixth Amendment right to obtain witnesses on his behalf and provide a meaningful defense. He claims the exclusion was prejudicial because Helen's testimony would have been "powerful and non-cumulative[.]" In particular, he emphasizes her testimony that "she did not hear anything on the night of the alleged rape of A.C., despite her bedroom being just down the hall and her bedroom door open."

[¶25.] In response, the State asserts that Guzman failed to preserve these arguments for appellate review because he did not, at the trial level, raise the constitutional arguments he now makes on appeal. Guzman disagrees, claiming that he preserved his constitutional arguments by resisting the State's request that the circuit court exclude Helen from testifying and by arguing that Helen should be permitted to testify as a witness to matters relevant to his defense.

[¶26.] "Generally, parties must object to specific court action and state the reason underlying their objection so that the circuit court has an opportunity to correct any error." *State v. Divan*, 2006 S.D. 105, ¶ 9, 724 N.W.2d 865, 869 (citation omitted). As such, this Court has in previous cases declined to address a constitutional claim on appeal when it was not presented to the circuit court. *See id.*; *State v. Fifteen Impounded Cats*, 2010 S.D. 50, ¶ 10, 785 N.W.2d 272, 277.

[¶27.] Here, however, Guzman specifically requested that the circuit court not preclude him from calling a defense witness with relevant testimony, and as other courts have determined, when a court excludes a proffered defense witness for violating a sequestration order, the exclusion could have constitutional ramifications. *See United States v. Schaefer*, 299 F.2d 625, 631 (7th Cir. 1962); *Longoria v. State*, 148 S.W.3d 657, 660 (Tex. Ct. App. 2004); 75 Am. Jur. 2d Trial § 180 (2d ed.); 29 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure Evidence* § 6246 (2d ed. 1987). This is because "[t]he right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense[.]" *Washington v. Texas*, 388 U.S. 14, 19, 87 S. Ct. 1920, 1923, 18 L. Ed. 2d 1019 (1967); *see also* U.S. Const. amend. VI (providing

that a criminal defendant has the right "to have compulsory process for obtaining witnesses in his favor"). We therefore conclude that Guzman sufficiently preserved his constitutional claim for appeal by arguing that despite the sequestration order violation, he should be permitted to call Helen in his defense because her testimony would be relevant to rebut A.C.'s testimony regarding the circumstances surrounding her alleged rape.

[¶28.] The State contends that even if the constitutional claim was preserved, the court did not err in excluding Helen's testimony because defense counsel knew Helen violated the sequestration order and did not bring it to the circuit court's attention. The State further asserts that Helen's exclusion as a witness was proper because her "exposure to other witnesses was likely extensive[,] and her testimony overlapped with several of the State's fact witnesses." In the State's view, Helen could have changed her testimony after listening to the witnesses to the unfair prejudice of the State.

[¶29.] This Court has not before examined a circuit court's exclusion of a *defendant's witness* for violating a sequestration order.[4] However, decisions from other courts addressing the issue note that the United States Supreme Court explained in *Holder v. United States*, 150 U.S. 91, 92, 14 S. Ct. 10, 10, 37 L. Ed. 1010 (1893), the seminal case generally addressing violations of sequestration

---

4. This Court's past cases related to prosecution witnesses violating sequestration orders. *See State v. Randle*, 2018 S.D. 61, 916 N.W.2d 461; *State v. Rough Surface*, 440 N.W.2d 746 (S.D. 1989); *State v. Dixon*, 419 N.W.2d 699 (S.D. 1988); *State v. Ashker*, 412 N.W.2d 97 (S.D. 1987). These cases all addressed whether a defendant's rights were prejudiced because a court failed to either exclude a State witness's testimony or grant a mistrial after a State witness violated a sequestration order.

orders, that "[i]f a witness disobeys the order of withdrawal, while he may be proceeded against for contempt, and his testimony is open to comment to the jury by reason of his conduct, he is not thereby disqualified, and the weight of authority is that he cannot be excluded on that ground, merely[.]" *See United States v. Washington*, 653 F.3d 1251, 1268 (10th Cir. 2011); *United States v. Rhynes*, 218 F.3d 310, 323 (4th Cir. 2000); *United States v. Hobbs*, 31 F.3d 918, 922 (9th Cir. 1994); *State v. Jordan*, 325 S.W.3d 1, 43 (Tenn. 2010); *State v. Lucas*, 896 So. 2d 331, 339 (La. Ct. App. 2005). This is because "[e]xclusion of a witness'[s] testimony is 'an extreme remedy' that 'impinges upon the right to present a defense,' and thus should be employed sparingly." *United States v. Smith*, 441 F.3d 254, 263 (4th Cir. 2006) (citation omitted).

[¶30.] Nevertheless, the Supreme Court has further held that the "right to exclude under particular circumstances may be supported as within the sound discretion of the trial court." *Holder*, 150 U.S. at 92, 14 S. Ct. at 10; *see also United States v. Kiliyan*, 456 F.2d 555, 560 (8th Cir. 1972) (providing that the decision whether to exclude a witness for a violation of a sequestration order is reviewed for an abuse of discretion); *Schaefer*, 299 F.2d at 631 (same); *United States v. Cropp*, 127 F.3d 354, 363 (4th Cir. 1997) (same). While the decision to exclude a witness is discretionary, this Court determines de novo whether a constitutional violation has occurred as a result of such an exclusion. *See State v. Dickerson*, 2022 S.D. 23, ¶ 29, 973 N.W.2d 249, 258–59. If such a constitutional violation has occurred, the circuit court has necessarily abused its discretion.

[¶31.] In considering whether the trial court abused its discretion in excluding a defense witness in *Kiliyan*, the Eighth Circuit Court of Appeals adopted the Seventh Circuit Court of Appeals' reasoning that the phrase "particular circumstances" as used in *Holder* means an "indication the witness was in court with 'the consent, connivance, procurement or knowledge of the appellant or his counsel.'" 456 F.2d at 560–61 (quoting *Schaefer*, 299 F.2d at 631). As to defense counsel's actions here, although he indicated that he was aware that Helen had been in the viewing room at some point during the State's case-in-chief, it is not clear from our review of the record that Helen's violation of the sequestration order was with the consent, connivance, or procurement of Guzman or his counsel. Importantly, the trial occurred during heightened COVID restrictions where spectators were not allowed in the gallery and instead watched the trial via livestreaming services in a different room of the courthouse. Thus, while it is undisputed that Helen viewed at least a portion of the trial, it is not so clear that defense counsel would have known at the time it was happening that such was occurring.

[¶32.] Moreover, while Guzman's argument to the circuit court focused on the limited nature of Helen's testimony and not his constitutional right to present a defense, the court should have considered the constitutional ramifications that would necessarily be implicated if Helen was excluded as a defense witness. As the United States Supreme Court explained in *Holder*, generally, a witness cannot be excluded merely on the ground that a sequestration order has been violated. 150 U.S. at 92, 14 S. Ct. at 10. Further, in regard to a defense witness, exclusion "is a

strongly disfavored sanction because of the severe consequences it holds for the defendant." *Hobbs*, 31 F.3d at 922.

[¶33.] Based on our review of the record, the total exclusion of Helen as a witness was too harsh a remedy for the violation of the sequestration order under the circumstances presented. Neither the circuit court nor counsel for either party elicited testimony from Helen to ascertain the extent of any potential taint to her proffered testimony. And although the State and defense counsel made representations to the court about their understanding of what had occurred, the only evidence presented to the court regarding when Helen was in the viewing room came from the State's witness, Fisher, who testified that he only observed Helen in the viewing room while L.G. testified. Notably, L.G. did not testify about any events related to A.C., and Guzman's counsel advised the court that Helen's testimony would be limited to the events on the night of A.C.'s sleepover at the Guzmans' home. Because there is no question that Helen's proffered testimony was relevant to matters at issue, and given the absence of evidence establishing that the sequestration violation occurred under circumstances that would warrant the severe sanction imposed here, the circuit court violated Guzman's constitutional right to call witnesses in his defense, and thereby abused its discretion, when it precluded Guzman from presenting any testimony from Helen.

[¶34.] In light of the circuit court's error, we must determine whether it was harmless. "The harmless error rule governs even constitutional violations, not requiring the automatic reversal of a conviction, provided the court is able to declare a belief beyond a reasonable doubt that the error was harmless and did not

contribute to the verdict obtained." *State v. Muhm*, 2009 S.D. 100, ¶ 35, 775 N.W.2d

508, 520–21 (citation omitted); *see* SDCL 23A-44-14 (providing that "[a]ny error,

defect, irregularity, or variance which does not affect substantial rights shall be

disregarded"). This Court recently noted that:

> Whether such an error is harmless in a particular case depends
> upon a host of factors, all readily accessible to reviewing courts.
> These factors include *the importance of the witness' testimony in
> the prosecution's case*, whether the testimony was cumulative,
> the presence or absence of evidence corroborating or
> contradicting the testimony of the witness on material points,
> the extent of cross-examination otherwise permitted, and, of
> course, the overall strength of the prosecution's case.

*Dickerson*, 2022 S.D. 23, ¶ 41, 973 N.W.2d at 263 (quoting *Delaware v. Van Arsdall*,

475 U.S. 673, 684, 106 S. Ct. 1431, 1438, 89 L. Ed. 2d 674 (1986)). "The State bears

the burden of proving beyond a reasonable doubt the error was harmless." *Id.* ¶ 40

(citation omitted).

[¶35.] While on appeal Guzman asserts that Helen's testimony was non-

cumulative, "powerful[,]" and that no one else could testify to not hearing anything

on the night of A.C.'s rape, in his argument to the circuit court, he downplayed the

testimony he intended to elicit from Helen. In particular, Guzman's counsel advised

the court multiple times that the testimony from Helen and Benny would be "very

limited" and that they would testify "that they were at the house the night of the

sleepover, and they didn't hear anything. That's it." Regardless of Guzman's

differing characterizations of the potential import of Helen's proffered testimony, a

review of her testimony from the first trial does not support that it would have been

"powerful" had it been allowed in the second trial.

[¶36.]       Helen testified at the first trial that A.C. only spent the night at her home one time and stated several times that the sleepover occurred in "early summer." But the testimony from A.C., her parents, the experts involved, and Guzman himself all indicate that A.C. spent the night at the Guzman home in November. It is not clear, therefore, whether Helen's recollection, if similar to her testimony at the first trial, even pertained to the night in question. She likely would have been impeached on this inconsistency had she been allowed to testify at the second trial.

[¶37.]       Further, while Guzman characterizes A.C.'s description of the rape as a "noisy" event and that Helen's testimony would have been "powerful" because it rebutted A.C.'s testimony that she cried and was comforted by Guzman, the point about A.C. crying was not as material to the case as Guzman contends. There was no testimony from A.C. suggesting that she was crying loudly such that others could hear, and Guzman's characterization fails to recognize that crying is often a silent event. In fact, A.C.'s forensic interview admitted at trial shows her silently crying while she describes the events in question.

[¶38.]       Moreover, even though Guzman was unable to use Helen's "limited" testimony to establish that others in the home did not hear anything the night of A.C.'s rape, Guzman was not prevented from presenting his defense theory challenging A.C.'s credibility through cross-examination of A.C. and several other witnesses called by the State. And despite the absence of Helen's testimony, Guzman's counsel nevertheless challenged A.C.'s version of the events by arguing to

the jury that the alleged rape and its aftermath, as described by A.C., would have been noisy and there were "people everywhere."

[¶39.]     Finally, the State's overall case against Guzman was very strong. Helen's proffered testimony did not relate to the claims by N.G. and L.G., who, along with W.B., described instances of sexual abuse by Guzman that were similar to those described by A.C.  Given the evidence in its totality, along with the fact that Helen was not in close proximity to the events in question, it is highly unlikely that testimony stating she did not hear anything on the night A.C. was allegedly raped would have impacted the jury's assessment of the charges presented. Therefore, we conclude that the error in excluding Helen as a witness was harmless beyond a reasonable doubt.

### 2.     *Whether the circuit court erred by admitting Guzman's testimony from his first trial.*

[¶40.]     Guzman contends that his right against self-incrimination was violated when the State introduced into evidence a transcript of his testimony from the first trial.  Guzman asserts his prior testimony was provoked by the State's introduction of "duplicitous evidence," specifically N.G.'s testimony regarding an additional instance of sexual abuse, in violation of his constitutional due process right to jury unanimity.  Guzman claims his testimony from the first trial is "fruit of [this] constitutional violation[,]" warranting its exclusion.  We review claims of alleged constitutional violations de novo.  *State v. Carothers*, 2005 S.D. 16, ¶ 7, 692 N.W.2d 544, 546 ("[A]n alleged violation of a constitutionally protected right is a question of law[.]" (citations omitted)).

[¶41.] To support his argument that his prior testimony should not be admitted, Guzman relies on *Harrison v. United States*, in which the United States Supreme Court addressed a scenario where a defendant took the stand "only after the [g]overnment had illegally introduced into evidence" wrongfully obtained confessions. 392 U.S. 219, 222, 88 S. Ct. 2008, 2010, 20 L. Ed. 2d 1047 (1968). In such instance, the Court determined that "the same principle that prohibits the use of confessions so procured also prohibits the use of any testimony impelled thereby—the fruit of the poisonous tree[.]" *Id.* "The question is not whether the [defendant] made a knowing decision to testify, but why." *Id.* at 223, 88 S. Ct. at 2010.

[¶42.] Here, even if Guzman decided to testify after the State elicited certain testimony from N.G., he has not alleged that this testimony was illegally obtained or unlawfully admitted. Further, Guzman's testimony did not respond to any particular testimony by N.G.; rather, he maintained his general denial and testified that he had not engaged in improper sexual conduct with any of the named victims. Moreover, beyond the conclusory statement that the State introduced duplicitous evidence, Guzman has failed to explain how the admission of N.G.'s testimony itself—which he deems "duplicitous"—violated his constitutional right to jury unanimity.

[¶43.] "Duplicity is the joining in a single count of two or more distinct and separate offenses." *State v. Babcock*, 2020 S.D. 71, ¶ 39, 952 N.W.2d 750, 762 (citation omitted). The concern relating to duplicitous charges is that when a "jury has multiple offenses to consider under a single count, the jury may convict without

#29722

reaching a unanimous agreement on the same act, thereby implicating the defendant's right to jury unanimity."[5]  *Muhm*, 2009 S.D. 100, ¶ 29, 775 N.W.2d at 517.  To assure jury unanimity, this Court has applied the "either or rule."  *Id.* ¶ 32, 775 N.W.2d at 518.  The rule requires one of the following steps to be taken:

> [T]he government must elect a single offense on which it plans to rely, and as long as the evidence at trial is limited to only one of the offenses in the duplicitous count, the defendant's challenge will fail.  Alternatively, if there is no election the trial court should instruct the jury it must find unanimously that the defendant was guilty with respect to at least one of the charges in the duplicitous count.

*Id.* (citation omitted).  When Guzman raised the unanimity concern in his pretrial motion in limine, the circuit court properly advised the parties at the outset of the trial of these two alternative ways to address the issue.

[¶44.]     Although the State had advised the circuit court and defense counsel that it would make all efforts to focus on specific incidents corresponding to the two charges pertaining to N.G., the State asked N.G. about a different incident between N.G. and Guzman.  Guzman objected, referring, in part, to his motion in limine seeking a directive that the State elect specific incidents for each charge concerning N.G.  In response to Guzman's objection, the State explained that it was eliciting testimony about this other incident because N.G. had initially disclosed this incident to her foster mother which prompted DSS to have N.G. interviewed again by Petro.  The State also explained that although it would be difficult to confine

---

5.     In addressing the defendant's allegation in *Muhm* that duplicitous charges deprived him of his constitutional right to due process and protection against double jeopardy, the Court referred to his claims as the "related constitutional concerns" pertaining to issues of duplicity and multiplicity.  2009 S.D. 100, ¶ 18, 775 N.W.2d at 514.

-22-

N.G.'s testimony given that she suffered multiple instances of sexual abuse over the course of the timeframe alleged in the indictment, it would attempt to limit N.G.'s testimony to the instance in Guzman's sister's bedroom and the other identified instance of sexual contact. Guzman ultimately withdrew his objection.

[¶45.] The events occurring thereafter fail to establish any constitutional violation of Guzman's right to a unanimous verdict. The State did not discuss the additional incident during its closing argument to the jury and instead elected to refer to only one incident of sexual penetration and one incident of sexual contact relating to N.G. The circuit court also included a unanimity instruction in the final instructions provided to the jury. Even if the nature of the evidence gave Guzman concern about his right to jury unanimity, the record is devoid of any evidence indicating that N.G.'s testimony about an additional incident of sexual contact compelled Guzman to testify in his defense. Therefore, the circuit court did not err in admitting his prior trial testimony.

> **3.      Whether the circuit court abused its discretion by admitting W.B.'s testimony.**

[¶46.] Guzman alleges that the circuit court abused its discretion in admitting other act evidence from W.B. under SDCL 19-19-404(b), claiming W.B.'s testimony was admitted for propensity purposes and that the testimony did not fall within the enumerated exceptions of the statute. He argues that the "lack of mistake" exception is inapplicable because he never advanced mistake as a defense and instead denied sexual contact altogether. He further claims that the circuit court's inclusion of the absence of mistake as one of the exceptions allowing for admission of this evidence suggests the court used a "blunderbuss" approach and

simply declared the other act evidence admissible without examining each theory of admissibility under the statute. Guzman also takes issue with the other Rule 404(b) grounds upon which the court admitted this evidence.

[¶47.] Under SDCL 19-19-404(b)(1), "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." However, "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." SDCL 19-19-404(b)(2). This Court reviews a circuit court's decision to admit other act evidence for abuse of discretion. *State v. Evans*, 2021 S.D. 12, ¶ 25, 956 N.W.2d 68, 79. "Prior to admitting the evidence, the circuit court must determine whether the evidence is relevant to a material issue other than character and whether its probative value is substantially outweighed by the danger of unfair prejudice." *Id.* "Unfair prejudice 'results from the capacity of the evidence to persuade by illegitimate means.'" *Id.* (citation omitted).

[¶48.] With respect to W.B.'s proffered testimony, the circuit court stated that this evidence went "to a number of things, but certainly intent, preparation, plan, [and] absence of mistake." At trial, W.B. testified to multiple incidents and types of sexual abuse. She explained that many of the incidents occurred during sleepovers with Guzman's children. One such incident occurred at Guzman's parents' house. W.B. explained that during this incident, she had fallen asleep, but she then woke up and found Guzman having sex with a female in the same room where W.B. and the other children were sleeping. W.B. testified that she later went back to sleep

but was awakened by Guzman touching her butt. She also testified to an incident that occurred in Guzman's sister's house where Guzman had engaged in sexually explicit conversations with her. He then had her sit on his lap and proceeded to touch her butt and thrust against it. W.B. described a further incident in which Guzman anally penetrated her in the laundry room of a home she described as "the big house." According to W.B., throughout the abuse Guzman had told her not to tell anyone because he would get in trouble.

[¶49.] This Court has acknowledged that other act evidence may be admissible "under the plan exception 'not only where the charged and uncharged acts are part of a single continuing conception or plot, but also where the uncharged misconduct is sufficiently similar to support the inference that they are manifestations of a *common* plan, design, or scheme . . . .'" *State v. Medicine Eagle*, 2013 S.D. 60, ¶ 18, 835 N.W.2d 886, 893 (citations omitted). "[W]here the defendant denies doing the charged act, evidence of a common plan or scheme to achieve the act is directly relevant to refute this general denial." *Id.* (citations omitted). Further, direct evidence is not required to prove the existence of a plan. *Id.* ¶ 19. Instead, the existence of a plan "can be shown circumstantially[,] with evidence that the defendant committed a series of similar but 'unconnected' acts." *Id.* (alteration in original) (citation omitted). "[A]ll that is required to show a common plan is that the charged and uncharged events 'have sufficient points in common.'" *Id.* (citation omitted).

[¶50.] The other act evidence elicited from W.B. is similar to the testimony of A.C. Guzman obtained access to both girls, who were friends with his daughters,

during sleepovers. He first gauged how comfortable the girls were with sexually charged questions, including whether he could see A.C.'s private parts and whether W.B. had been sexually active.[6] Both girls were approached by Guzman in a laundry room and were told following their sexual abuse not to tell anyone. Because of these similarities, W.B.'s testimony was relevant and admissible evidence of a common plan or scheme.

[¶51.] This evidence was also admissible to show intent. Contrary to Guzman's claim that intent was not an issue in this case, the sexual contact charge regarding N.G. required proof of Guzman's specific intent. *See State v. Ondricek*, 535 N.W.2d 872, 874 (S.D. 1995) (observing that "where specific intent is an element of an offense, proof of similar acts may be admitted" even when the defense is a complete denial). However, as to the circuit court's reference to the other act evidence showing an absence of mistake, this Court previously concluded that "lack of mistake" was inapplicable in a child rape case where the defendant pled not guilty and denied the acts occurred. *State v. Steichen*, 1998 S.D. 126, ¶ 26, 588 N.W.2d 870, 876 (determining the court erred by admitting other acts evidence under this exception). Nevertheless, because the other act evidence was properly admitted under other exceptions, there is no reversible error in the court's admission of the evidence on an inapplicable exception. *See id.*

[¶52.] Guzman further claims that the admission of W.B.'s testimony should have been excluded under Rule 403 as unfairly prejudicial. As to this claim, the

---

6. As argued by the State, preparation and plan may go hand in hand, particularly in a case involving sexual contact with children, where the "preparation" involved similar instances of grooming of both W.B. and A.C.

circuit court concluded that "[t]he probative value [of the other act evidence was] significant in this case" and determined that it was not "prejudicial in a legal sense." We agree that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. We also note that prior to W.B. testifying at trial, and in its final instructions, the circuit court gave a proper limiting instruction to the jury regarding how and for what purposes the evidence could or could not be considered. *See Evans*, 2021 S.D. 12, ¶ 36, 956 N.W.2d at 82 (observing "that the potential for unfair prejudice can be alleviated by the giving of a limiting instruction"). The circuit court did not abuse its discretion in admitting W.B.'s testimony.

### 4. Whether, under plain error review, the circuit court erred by admitting Hollie Strand's testimony.

[¶53.] Guzman argues Strand's testimony was cumulative to Petro's testimony and was therefore inadmissible. He claims the testimony from each expert was "nearly identical" and that "Strand was not capable of offering any relevant expert opinion that Petro could not." Further, Guzman asserts that Strand's testimony "was an improper attempt to bolster the testimony of the alleged victims with additional expert opinion." Guzman acknowledges that he did not assert the cumulative nature of Strand's testimony when relating his objection at trial, but on appeal, he claims he did not do so "because [Strand] was the first forensic interviewer to testify, and her testimony was not cumulative at that time." Notably, Guzman also did not object to Petro's later testimony at trial as cumulative to Strand's. Guzman requests that we review for plain error whether Strand's testimony was cumulative.

[¶54.] "To demonstrate plain error, [the appellant] must establish that there was: '(1) error, (2) that is plain, (3) affecting substantial rights; and only then may we exercise our discretion to notice the error if (4) it seriously affect[s] the fairness, integrity, or public reputation of the judicial proceedings.'" *State v. Guziak*, 2021 S.D. 68, ¶ 10, 968 N.W.2d 196, 200 (citations omitted).

[¶55.] In considering Guzman's argument that the circuit court erred in admitting Strand's testimony, we note that SDCL 19-19-403 allows a circuit court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . needlessly presenting cumulative evidence." However, "[t]he rule 'favors the admission of evidence in the absence of strong considerations to the contrary.'" *State v. Falkenberg*, 2021 S.D. 59, ¶ 43, 965 N.W.2d 580, 592 (citation omitted). Evidence is cumulative when it is "of the same character as evidence previously produced and which supports the same point." *State v. Knecht*, 1997 S.D. 53, ¶ 7, 563 N.W.2d 413, 417 (citation omitted).

[¶56.] Strand's testimony was not cumulative to Petro's testimony. Although their credentials have notable similarities—they are both trained forensic interviewers with master's degrees and have an employment history at the Child Advocacy Center—their testimony was admitted for distinct purposes. Strand's testimony primarily focused on trauma and how it affects a child's decision to disclose sexual abuse. Strand also testified to the various ways in which children disclose abuse, including the use of "script language" and fantastical elements. While some of Strand's topics overlapped with parts of Petro's testimony, Petro's testimony focused on the techniques she used in the interviews she conducted with

the victims in this case as well as her opinion on why the victims responded in certain ways.

[¶57.]     In short, Strand testified more generally to the theories underlying forensic interviewing while Petro testified to the actual interviews conducted with the named victims in this matter.  Further, our review of a claim that evidence was cumulative is not centered on whether two experts *could* have testified to the same topics but instead on whether their actual testimony was "of the same character" and "support[ed] the same point."  *See id.* (citation omitted).  Given the distinctions in the character of each witness's testimony, the circuit court did not err in admitting Strand's testimony.  Because there was no error, we need not analyze the remaining prongs of plain error review.

### 5.     *Whether the circuit court abused its discretion by excluding A.G.'s forensic interview.*

[¶58.]     Guzman asserts that A.G.'s forensic interview was relevant and admissible because A.G. disclosed incidents of sexual conduct similar in nature to those disclosed by his sisters "in response to the same line of questioning, by the same forensic interviewer, at roughly the same time as the three named victims[.]"  Guzman also asserts that "[w]hether children can fabricate stories of sexual abuse was highly relevant at trial" and that A.G. "made unbelievable allegations of rape by an unnamed male neighbor which were . . . obviously untrue."  He then suggests that A.G.'s fabrication supports the general notion that all children can fabricate stories of sexual abuse, a notion which in his view supports his claim that the named victims here fabricated their allegations of abuse.

[¶59.]     In response, the State asserts that the interview was irrelevant given that A.G. is not a victim in this case and his rape allegation was not against Guzman. The State also contends that Guzman has failed to show the allegation was false and claims that, if admitted, it would have resulted in "a trial within a trial" that would confuse the issues before the jury.

[¶60.]     "The trial court[']s evidentiary rulings are presumed to be correct. We review those rulings under an abuse of discretion standard." *State v. Boston*, 2003 S.D. 71, ¶ 14, 665 N.W.2d 100, 105. "An abuse of discretion 'is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable.'" *State v. Delehoy*, 2019 S.D. 30, ¶ 22, 929 N.W.2d 103, 109 (citations omitted). "To necessitate reversal, 'not only must error be demonstrated, but it must also be shown to be prejudicial.'" *State v. Reeves*, 2021 S.D. 64, ¶ 11, 967 N.W.2d 144, 147 (quoting *State v. Shelton*, 2021 S.D. 22, ¶ 16, 958 N.W.2d 721, 727). "An error is prejudicial when 'in all probability [the error] produced some effect upon the jury's verdict and is harmful to the substantial rights of the party assigning it.'" *Id.*

[¶61.]     SDCL 19-19-402 provides that "[a]ll relevant evidence is admissible" unless an exclusionary rule prohibits it. Relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." SDCL 19-19-403.

[¶62.]     The issue before the jury was not whether A.G. fabricated a claim of sexual abuse but, instead, whether his sisters or A.C. had done so. Although there

were similarities between the sexual conduct A.G. disclosed and that disclosed by the victims in this case, A.G.'s disclosure did not involve Guzman. Importantly, Guzman has failed to identify any authority supporting the admissibility of evidence that a sibling of a named victim had fabricated an unrelated claim of sexual assault by someone other than the defendant to establish an attenuated claim that the named victim likewise fabricated claims. And the record is devoid, except for Guzman's assertion, of any indication that A.G.'s allegation was in fact fabricated, a necessary predicate upon which his argument hinges that would likely have evolved into a minitrial on a collateral issue had this evidence been admitted. The circuit court did not abuse its discretion in excluding this recording.

[¶63.]    Even if the circuit court abused its discretion in excluding the recording of A.G.'s forensic interview, Guzman cannot establish the error was prejudicial. Guzman conducted a thorough cross-examination of Petro, asking her about a child's ability to fabricate stories as well as her forensic interview techniques.[7] In doing so, Guzman elicited testimony from Petro that children can fabricate stories and that such fabrication "can be the result of submitting to the suggestion of authority figures[.]" Also, in closing argument, Guzman noted a study

---

7.    Although Guzman suggests that this Court should review for plain error the issue of whether he should have been allowed to use the evidence regarding A.G.'s allegations while cross-examining Petro, there is no claim of judicial error for this Court to review given the circumstances here. After the circuit court ruled that the recording offered by Guzman was inadmissible, the court advised counsel that it would consider whether this evidence could be referenced during cross-examination of Petro so long as the request was "raised outside the presence of the jury first[.]" Despite the court's invitation to revisit this issue at trial, at no time before or during his cross-examination of Petro did Guzman make this request.

that Petro had cited in which eleven percent of the children in the study fabricated a detailed event. Finally, given the totality of the other evidence admitted in this case, Guzman has failed to establish that had this additional evidence been admitted, there is a reasonable probability that the jury would have reached a different verdict.

### 6. Whether the circuit court abused its discretion by ordering Guzman to reimburse Pennington County for expert witness fees.

[¶64.] Guzman asserts that the circuit court abused its discretion in ordering that he reimburse Pennington County for $11,190 paid for expert fees. He argues that expert witness fees may not be imposed as costs under SDCL 23A-27-26 and are instead analogous to law enforcement wages, which this Court has determined are not "costs of the prosecution" as referenced in this statute. Guzman also argues that expert witness fees are "expenses of special agents" and therefore cannot be assessed as costs. In response, the State argues expert witness fees are appropriate under SDCL 23A-27-26 so long as the costs were necessary to the prosecution. *See State v. Baldwin*, 299 N.W.2d 820, 822 (S.D. 1980) (noting that where an expert's testimony is not necessary, the fees incurred could not be allocated to the defendant). In presenting this challenge to the costs ordered by the court, Guzman has not asserted that any particular expert was unnecessarily called or retained by the State.[8]

---

8. The State requested costs for the following experts: Dr. David Mueller, Dr. Cara Hamilton, Tifanie Petro, Brandi Tonkel, and Dr. Brooke Eide. Dr. Hamilton, a pediatrician, and Dr. Eide, an emergency room physician, physically examined A.C. after she disclosed to her parents that she had been

(continued . . .)

[¶65.]     With regard to whether SDCL 23A-27-26 allowed for the imposition of the costs imposed here, the statute provides:

> In all criminal actions, upon conviction of the defendant, the court may adjudge that the defendant pay the whole or any part of the costs of that particular prosecution in addition to the liquidated costs provided by § 23-3-52. However, the costs shall not include items of governmental expense such as juror's fees, bailiff's fees, salaries and expenses of special agents, and reporter's per diem. Payment of costs may be enforced as a civil judgment against the defendant.

In *Baldwin*, this Court determined that expert witness fees are costs of the prosecution. 299 N.W.2d at 822 (noting that expert witness fees are properly taxed in a criminal case when "there was actual, apparent, or probable necessity for incurring" the costs). Therefore, SDCL 23A-27-26 authorized the circuit court to order that Guzman pay for the State's expert witness fees.

[¶66.]     Additionally, Guzman has failed to establish that any of these witnesses were "special agents" of the State such that their fees should be excluded under SDCL 23A-27-26. The only expert witness called by the State that could have conceivably fallen into this category would be Hollie Strand, who is currently employed by the Pennington County Sheriff's Office, but the State did not request reimbursement for her fees. We therefore conclude that the circuit court did not abuse its discretion in deciding to include expert witness fees in Guzman's judgment as part of the costs of prosecution. *See Baldwin*, 299 N.W.2d at 822 (applying the abuse of discretion standard under a previous version of the statute).

---

(. . . continued)
   raped. Dr. Mueller, a pediatrician, was noticed as a witness and provided consultation to the State but did not testify.

[¶67.]    Affirmed.

[¶68.]    KERN, SALTER, and MYREN, Justices, concur.

[¶69.]    JENSEN, Chief Justice, concurs in result.


JENSEN, Chief Justice (concurring in result).

[¶70.]    I join the majority opinion but concur in the result on issue six of the opinion addressing prosecution costs.

[¶71.]    I would not be so quick to dismiss Guzman's statutory argument that the State's expert witness fees are not prosecution costs under SDCL 23A-27-26. The language of the statute does not specifically provide for expert witness fees as costs of prosecution, and the statute excludes "items of governmental expense such as juror's fees, bailiff's fees, salaries and expenses of special agents[.]" However, the Court in *State v. Baldwin* undoubtedly considered expert witness fees to be costs of prosecution by stating that SDCL 23A-27-26 "would generally allow for the imposition of the 'costs of prosecution' upon a defendant. It should not, however, give the prosecuting attorney an unbridled right to bring in an unneeded expert from out of state and then request that the defendant be required to pay the costs incurred in bringing in the expert." *Baldwin*, 299 N.W.2d 820, 822 (S.D. 1980). In view of *Baldwin*, which we have not been asked to distinguish or revisit, I join the majority opinion in affirming the circuit court's decision to assess the State's expert witness fees as costs of prosecution.

[¶72.]    Additionally, I question whether the language of SDCL 23A-27-26 allows a court to assess the costs of a non-testifying expert witness hired by the State for consulting purposes or other reasons. Even if such fees are considered

costs of prosecution, the State made no showing that the $500 in fees paid to Dr. Mueller, as a non-testifying expert witness, was an actual, apparent, or probable necessity as required by *Baldwin*. *Baldwin*, 299 N.W.2d at 822 ("We see no actual, apparent, or probable necessity for bringing in this expert witness."). When an expert testifies the testimony provides the circuit court with a record to assess necessity, but the same cannot be said for Dr. Mueller as a non-testifying expert. There is no indication that Dr. Mueller saw any of the victims, and the State did not make any showing why its consultation with him prior to trial was necessary to prosecute the case against Guzman. Nonetheless, I join in affirming because Guzman did not challenge the adequacy of the State's necessity showing for Dr. Mueller before the circuit court or in his brief to this Court.