#30218-a-SPM
**2024 S.D. 65**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

CHRISTOPHER SCHOCKER,                          Respondent and Appellee,

    v.

BRENT FLUKE, Warden,
Mike Durfee State Prison,                          Petitioner and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIFTH JUDICIAL CIRCUIT
ROBERTS COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE RICHARD A. SOMMERS
Judge

* * * *

MARTY J. JACKLEY
Attorney General

MATTHEW W. TEMPLAR
Assistant Attorney General
Pierre, South Dakota                          Attorneys for petitioner and
    appellant.


DAVID A. GEYER of
Delaney, Nielsen & Sannes, P.C.
Sisseton, South Dakota                          Attorneys for respondent and
    appellee.

* * * *

CONSIDERED ON BRIEFS
AUGUST 29, 2023
REASSIGNED
JULY 18, 2024
OPINION FILED **10/23/24**

#30218

MYREN, Justice (on reassignment).

[¶1.] Christopher Schocker was convicted of aggravated assault against a law enforcement officer. This Court summarily affirmed his conviction on direct appeal. Schocker sought a writ of habeas corpus on the grounds that he received ineffective assistance of counsel at trial. After an evidentiary hearing, the habeas court concluded Schocker had been denied the effective assistance of counsel in violation of the state and federal constitutions and vacated his conviction and sentence. This Court issued a certificate of probable cause, and the State appealed. We affirm.

**Factual and Procedural Background**

[¶2.] On November 21, 2018, Officer Blake Swanson, a Game, Fish and Parks conservation officer, received a tip that two individuals poached a deer on the outskirts of Summit, South Dakota. The tip included a description of the vehicle, as well as information that Doris Schocker owned the vehicle. Officer Swanson then traveled to her residence northwest of Summit in Roberts County.

[¶3.] When he arrived at her house, Officer Swanson noticed individuals dragging a deer out of a red pickup that matched the description of the vehicle given in the tip.[1] The pickup was backed into a wide corridor between rows of outbuildings. A horse corral blocked the end of the corridor. Officer Swanson parked his vehicle about a car length from the front of the pickup on the passenger side. He approached the individuals and introduced himself. Doris took a deer tag

---

1. Officer Swanson's body camera recorded the entire encounter and the investigation that followed. The video is approximately 80 minutes in length.

-1-

from her pickup and handed it to her son, Chris Schocker, who began field-dressing the deer.[2] The other individuals present were Jeffry Hopkins and Kevin Morsching. After briefly making small talk with the men, Officer Swanson asked Doris to come to his vehicle. Once in the vehicle, Officer Swanson learned that Doris had a landowner deer tag, which permitted her to harvest a deer on her property. Doris claimed that she shot the deer behind one of the barns and was alone at the time she did so. Officer Swanson confronted her with the information he received from the tip. Eventually, Doris admitted, and Morsching later confirmed, that Morsching shot the deer without a license.

[¶4.] After visiting with Doris, Officer Swanson concluded that hunting violations had occurred. Doris remained in the vehicle while Officer Swanson got out and walked toward the men, informing them that he was confiscating the deer. Officer Swanson did not explain the reason for his decision at that time. Schocker immediately responded in a matter-of-fact tone, "No you're not!" When Officer Swanson again stated, "Yeah, it's going to come with me, okay?" Schocker responded forcefully, "No, you're not!"

[¶5.] At that point, Schocker moved directly in front of Officer Swanson in an intimidating manner so that the two men were almost face-to-face. Officer Swanson warned Schocker, "Don't come any closer to me, do you understand?" Schocker stepped backward but belligerently asked Officer Swanson, who was in uniform, "What gives you the right to do that?" Officer Swanson answered, "I've

---

2. By this point, the third man in Doris's group was standing in the shadows watching from just inside the open door of a nearby outbuilding.

already talked to Doris, okay?" At the same time, Officer Swanson held his hand up, continuing to warn Schocker to stay back.

[¶6.] In the meantime, Doris approached the group from Officer Swanson's pickup and said, "He's going to take the deer, because he saw it happen, he saw it happen, he says." With that, Officer Swanson pointed toward Schocker again and warned him, "And don't take another step closer to me, do you understand?"

[¶7.] As Schocker moved back behind the deer, a brief verbal exchange took place between Doris and Officer Swanson, and Doris told him to take the deer. Morsching had gone into the area of one of the nearby sheds and was not engaged with the other individuals. Officer Swanson pointed at Morsching and asked him, "You want to come help me put [the deer] in the back?" Before he could answer, Schocker interjected, pointed at him, and ordered sharply, "You don't help him! Stay right there!"

[¶8.] Doris told Officer Swanson, "See, it's making him kind of angry." At about the same time, Schocker pointed toward Officer Swanson and then the deer and said, "You, You want that deer, you do it!" Officer Swanson replied, "We'll get [the deer] up there if that's the way you want to be, okay?" Schocker answered, "I ain't helping!"

[¶9.] Doris again commented, "It does make people kind of angry I guess . . . Well, you can't blame them for getting angry." Officer Swanson asked Doris, "Well, do you understand?" and Doris replied, "Yeah." Officer Swanson then asked Schocker, still standing nearby, "You want to stay there?" Schocker held his hands out to his sides, palms up, saying, "I'm on my own property, you can go to hell!"

[¶10.] At that point, Doris again tried to calm the situation, saying, "Hey, don't get that way." Officer Swanson interjected, commenting, "Doris has been plenty, plenty cordial with me, alright?" Schocker replied, "Well, I don't think you'll find that with me." Doris again told Schocker, "That's enough."

[¶11.] Officer Swanson next turned to Hopkins, who had been standing silently to one side of the deer and observing the entire time. Officer Swanson asked Hopkins, "Do you mind helping me?" Doris and Schocker both quickly interjected, saying, "No!" Then Schocker repeated more forcefully, "No!" Hopkins held his hands up, indicating that he did not want to be involved in the situation. As Officer Swanson began dragging the deer to his vehicle, Doris asked what would happen to the tag on the deer's leg. Officer Swanson replied that he would be taking both the tag and the deer as evidence. Schocker again became agitated and began stating obscenities under his breath.

[¶12.] Schocker approached Doris, who muttered something to him that cannot be understood on the video. Schocker can then be heard yelling loudly and clearly, "Horseshit!" At that point, Officer Swanson had turned away from Schocker and Doris so that the video shows only the side of one of the outbuildings. When Officer Swanson turned back around, Schocker was standing directly behind the open tailgate of Doris's pickup. Doris was beside the rear wheel on the passenger side of the vehicle walking slowly toward Officer Swanson with her back to Schocker. Officer Swanson and the deer were just past the front corner of the passenger side of the same vehicle.

[¶13.]     As Officer Swanson was dragging the deer across the ground, he noticed Schocker come from the backside of Doris's pickup with a hunting knife in his hand.  Schocker did not move quickly toward Officer Swanson, but he did move deliberately.  However, before he was even with Doris, Officer Swanson sharply warned Schocker, "You come any closer with that f***ing knife, that is the last day you will."  Although it cannot be seen on the video, Officer Swanson later testified that he reached for his service weapon at that same moment, but it did not clear the holster.  Immediately upon hearing Officer Swanson's warning, Schocker turned back toward the tailgate of Doris's pickup and put the knife down.

[¶14.]     Officer Swanson then called for backup.  Two highway patrolmen and a conservation officer arrived on the scene in response to Officer Swanson's request for assistance.  Officer Swanson placed Schocker under arrest for several offenses.

### The criminal trial

[¶15.]     Schocker was charged with possession of a firearm by a person with a prior drug conviction (SDCL 22-14-15), possession of a loaded firearm while intoxicated (SDCL 22-14-7), and aggravated assault against a law enforcement officer (SDCL 22-18-1.05).  Schocker applied for court-appointed counsel, and Robert Doody was appointed to represent him.  Following a preliminary hearing, Schocker pleaded not guilty at his arraignment.  Between the date of his arraignment and jury trial, Schocker was convicted of a separate felony in Codington County and transported to prison.

[¶16.]     In preparation for trial, Doody spoke with Schocker and reviewed Officer Swanson's body camera footage, but he never interviewed Hopkins or

Morsching. Schocker and Doody disagree on the number of times Doody and Schocker spoke; however, Schocker claimed that Doody never called him while he was incarcerated and did not answer his letters. Schocker's trial was moved up on the court's trial calendar and set to begin on November 7, 2019. Because of his incarceration, Schocker did not arrive in town until the night before his trial. Doody and Schocker briefly met that night to discuss the case. During pretrial hearings, the State dismissed the other charges and proceeded only with the aggravated assault charge.

[¶17.] After jury selection and opening statements, the State called Officer Swanson as its only witness. During his testimony, the State introduced two exhibits: the video recording from his body camera[3] and a partial plat map depicting the location of the Schocker residence within Roberts County. The State rested its case-in-chief and the defense called Doris as its only witness. Doris testified that prior to Schocker picking up the knife, she told him to cut the tag off the deer. Schocker elected not to testify at trial.

[¶18.] During their deliberations, at the jury's request, the court replayed the portion of Officer Swanson's body camera video that had been admitted to evidence. Ultimately, the jury returned a guilty verdict on the aggravated assault charge. The circuit court considered a presentence investigation and sentenced Schocker to twenty-five years in the state penitentiary, with fifteen years suspended and credit for time served.

---

3. While the video of the entire encounter was admitted into evidence, the jury was shown only the portion from 11:30-14:27.

[¶19.]     Doody filed a notice of appeal for Schocker but later moved to withdraw as counsel.  This Court remanded the matter to the circuit court for consideration of Doody's motion.  The circuit court allowed Doody to withdraw as counsel and appointed David Geyer in his place.  In his direct appeal, Schocker alleged there was insufficient evidence to support the jury's verdict.  We summarily affirmed the conviction.  *State v. Schocker*, 955 N.W.2d 775 (S.D. 2021) (unpublished table decision) (summary disposition).[4]

### *The habeas hearing*

[¶20.]     With Geyer's assistance, Schocker applied for a writ of habeas corpus, alleging he was denied the effective assistance of counsel at trial in violation of the Sixth Amendment of the United States Constitution and Article VI, Section 7 of the

---

4.     The State contends that the "law of the case" doctrine applies because we had previously determined in Schocker's direct appeal that there was sufficient evidence to sustain the jury's guilty verdict when affirming his conviction. However, the State confuses this doctrine with the doctrine of res judicata. The law of the case doctrine is not applicable to issues raised in a separate habeas action. *See In re Pooled Advocate Trust*, 2012 S.D. 24, ¶ 24, 813 N.W.2d 130, 139 (noting that the "law of the case rule involves the effect of a previous ruling within one action on a similar issue of law raised subsequently within the *same* action" whereas "the rules of res judicata apply to previous rulings in an action on a similar determination in a *subsequent* action")  It is true that the doctrine of res judicata could preclude some ineffective assistance claims raised in a habeas action. *See, e.g.*, *Neels v. Dooley*, 2022 S.D. 4, ¶¶ 20, 25, 969 N.W.2d 729, 737–38 (noting that a determination that a defendant failed to establish error or prejudice on direct appeal may preclude a subsequent ineffective assistance claim alleging the same underlying trial error or implicating the same examination of the existing trial record to determine prejudice).  However, Schocker's ineffective assistance claim that his counsel failed to investigate and present witness testimony was not addressed by this Court in his direct appeal and the prejudice inquiry in this habeas action is different than our direct appeal inquiry as to whether the existing trial record was sufficient to support the guilty verdict.  Therefore, the doctrine of res judicata is also inapplicable.

South Dakota Constitution.[5] The circuit court granted a provisional writ ordering the State to file a return. The State's return denied Schocker's allegations, and the matter was set for trial.

[¶21.] At the habeas trial, Schocker testified and called five witnesses: Doody, Hopkins, Morsching, Doris, and an expert witness, Attorney Brandon Taliaferro. Schocker questioned Doody regarding his decision not to interview Hopkins and Morsching prior to trial, as well as his decision not to have either testify at trial. Doody explained that he was able to gather all the necessary information for trial through Schocker and the 80-minute video recording and that his decision not to call Hopkins or Morsching to testify was part of his trial strategy. He testified that "there was a body camera footage that clearly indicated what happened that day. I didn't think that those two gentlemen had anything to really offer that wasn't already on the videotape." Doody maintained that he believed the video captured the event and was proof, by itself, that there was insufficient evidence to convict Schocker of the charge.

[¶22.] Schocker also asked Doody about the steps he took to prepare for trial, including when and how much time he spent preparing, why he did not interview Hopkins and Morsching, his limited communication with Schocker and the other witnesses, and why he did not file a motion in limine, or at least object at trial, to the testimony of Officer Swanson regarding his subjective fear of Schocker. The

---

5. We have held that "[t]he right of an accused in a criminal action to the assistance of counsel [ ] guaranteed under Article VI, Section 7 of the South Dakota Constitution . . . follows the Sixth Amendment standards under the United States Constitution." *State v. McBride*, 296 N.W.2d 551, 553 (S.D. 1980) (citation omitted).

State introduced Doody's time log, which revealed that he spent a total of 48.4 hours on Schocker's criminal case. Doody's out-of-court preparation amounted to 25.9 hours, the overwhelming majority of which was done in the three days preceding the trial.

[¶23.] Schocker called Taliaferro as an expert in the field of criminal defense and trial strategy. Taliaferro, at the time of the habeas hearing, had been an attorney for fourteen years, serving three as a prosecutor and eleven as a defense attorney, with experience working on roughly thirty prior habeas cases. Taliaferro testified that based on his review of the file, Schocker's only viable defense was to show that he intended to cut the tag off the deer, not to assault or threaten Officer Swanson. Taliaferro disagreed with many of Doody's actions while representing Schocker, including his failure to interview and call Hopkins and Morsching, his failure to use favorable portions of the video, his lack of trial preparation, and the content of his opening and closing statements. Taliaferro thought Doody's frequent references to Officer Swanson's subjective fear and his characterization of the case as a "tough decision" for the jury were inappropriate. Ultimately, Taliaferro opined that Doody's performance fell below the standard required of counsel and that such deficient conduct resulted in prejudice to Schocker.

[¶24.] The habeas court issued a memorandum decision granting habeas relief. The habeas court noted that, out of the five individuals present during the incident, Doody only called Doris as a witness and never made any effort before trial to speak with Hopkins or Morsching. The habeas court detailed Hopkins's

professional background and concluded that, based on Hopkins's background and testimony from the habeas hearing, he was "very credible."

[¶25.]    At the habeas hearing, Hopkins testified that prior to Schocker picking up the knife, Schocker stated that he was going to cut the tag off. Hopkins was then asked: "What was your understanding of Mr. Schocker's intent when he grabbed the knife and walked toward the deer?" He responded, "He was going to cut the tag off it, he wanted to keep the tag." The court determined that this testimony would have been "very important" for the jury to hear. The habeas court concluded there was no justification for Doody's failure to, "at a minimum," talk to the witnesses or to have them interviewed by an investigator and that Doody's failure was "magnified" by Hopkins's testimony that Schocker was moving forward to retrieve the tag and not going after Officer Swanson. The habeas court deemed this "crucial testimony" for the defense and rejected the view that the failure to speak to eyewitnesses was a trial strategy.[6] The habeas court concluded that if the jury had heard Hopkins's testimony, it "could have, and probably would have, reached a different verdict." Thus, the habeas court determined that Doody's performance was deficient, that the deficiency "clearly prejudiced" Schocker, and that it constituted ineffective assistance of counsel. The habeas court entered findings of fact and conclusions of law in support of its decision.

---

6.    In contrast, the habeas court found that Morsching's testimony likely would not have affected the outcome of the trial given his habeas testimony that he did not see the knife incident.

[¶26.]    The circuit court denied the State's request for a certificate of probable cause. After that, this Court granted the State's request for a certificate of probable cause. The State appeals.

## Standard of Review

[¶27.]    "Because habeas corpus is a collateral attack upon a final judgment, our scope of review is limited." *Wright v. Young*, 2019 S.D. 22, ¶ 10, 927 N.W.2d 116, 119 (citation omitted). "We review only: '(1) whether the court had jurisdiction of the crime and the person of the defendant; (2) whether the sentence was authorized by law; and (3) in certain cases whether an incarcerated defendant has been deprived of basic constitutional rights.'" *Id.* (quoting *Engesser v. Young*, 2014 S.D. 81, ¶ 22 n.1, 856 N.W.2d 471, 478 n.1). Schocker's claim of ineffective assistance of counsel proceeds under the third category.

[¶28.]    "Claims of ineffective assistance of counsel must be evaluated in light of the totality of the circumstances." *Dillon v. Weber*, 2007 S.D. 81, ¶ 11, 737 N.W.2d 420, 425 (citation omitted). Schocker must prove by a preponderance of the evidence that he is entitled to habeas relief. *See McDonough v. Weber*, 2015 S.D. 1, ¶ 15, 859 N.W.2d 26, 34.

[¶29.]    As a general rule, "[w]e review a circuit court's determination of a Sixth Amendment ineffective assistance of counsel claim as a mixed question, reviewing the court's decision on the constitutional issue de novo and its findings of fact for clear error." *Spaniol v. Young*, 2022 S.D. 61, ¶ 21, 981 N.W.2d 396, 403 (quoting *Reay v. Young*, 2019 S.D. 63, ¶ 13, 936 N.W.2d 117, 120). This Court "may substitute its own judgment for that of the circuit court as to whether defense

counsel's actions or inactions constituted ineffective assistance of counsel."

*Engesser v. Dooley*, 2008 S.D. 124, ¶ 10, 759 N.W.2d 309, 313 (quoting *Baldridge v. Weber*, 2008 S.D. 14, ¶ 21, 746 N.W.2d 12, 17).[7]

## Analysis and Decision

[¶30.]     Claims of ineffective assistance of counsel are analyzed under the two-prong test established in *Strickland v. Washington*:

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversar[ial] process that renders the result unreliable.

---

7.     Schocker argues that the State's objections to the habeas court's findings of fact and conclusions of law were untimely and, therefore, the scope of our review on appeal is limited.  Schocker relies on SDCL 15-6-52(a), which provides: "The court may not sign any findings therein prior to the expiration of five days after service of the proposed findings during which time the parties may in writing submit to the court and serve on their adversaries their objections or additional proposals."  In its memorandum opinion, the habeas court directed Schocker to prepare findings of fact and conclusions of law.  While the record contains a certificate of service indicating that Schocker served the State with proposed findings of fact and conclusions of law on September 13, 2022, they are not included in the record.  The record reflects that the habeas court signed its findings and conclusions on September 22, 2022.  Notably, on September 26, 2022, when the State submitted its objections to the habeas court's findings of fact and conclusions of law, the court did not find that the objections were untimely or indicate that it would penalize the State or refuse to consider the objections.  *See Sigler v. Sigler*, 2017 S.D. 85, ¶ 11 n.2, 905 N.W.2d 308, 311 n.2 (declining to limit review on appeal where the circuit court "did not penalize" the litigant for an untimely submission of proposed findings of fact or conclusions of law).  Under the circumstances presented here, we decline to limit our review on appeal.

*Reay*, 2019 S.D. 63, ¶ 13, 936 N.W.2d at 120 (quoting *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984)).

[¶31.]     Regarding the first prong, "[t]he petitioner 'must show that counsel's representation fell below an objective standard of reasonableness.'" *McDonough*, 2015 S.D. 1, ¶ 22, 859 N.W.2d at 37 (quoting *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2064). However, we begin with a "strong presumption that counsel was competent." *Spaniol*, 2022 S.D. 61, ¶ 23, 981 N.W.2d at 404 (citation omitted). The question is whether counsel was deficient under prevailing professional norms, as opposed to "compar[ing] counsel's performance to that of some idealized 'super-lawyer[.]'" *Denoyer v. Weber*, 2005 S.D. 43, ¶ 18, 694 N.W.2d 848, 855 (citations omitted).

[¶32.]     "In reviewing counsel's performance, we must make 'every effort' to 'eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Spaniol*, 2022 S.D. 61, ¶ 23, 981 N.W.2d at 404 (quoting *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065). This Court's "function is not to 'second guess the decisions of experienced trial attorneys regarding matters of trial tactics unless the record shows that counsel failed to investigate and consider possible defenses.'" *Reay*, 2019 S.D. 63, ¶ 14, 936 N.W.2d at 121 (quoting *Randall v. Weber*, 2002 S.D. 149, ¶ 7, 655 N.W.2d 92, 96).

[¶33.]     If we conclude that Doody's performance was deficient, the second prong of *Strickland* requires us to determine whether the deficient performance prejudiced Schocker. *See Spaniol*, 2022 S.D. 61, ¶ 24, 981 N.W.2d at 404. To

establish prejudice, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068.

### I. Whether trial counsel's performance was deficient for failing to interview additional witnesses prior to trial.

[¶34.]     Schocker's primary claim for ineffective assistance, and the claim the habeas court relied upon in granting habeas relief, centers on Doody's failure to interview Hopkins and call him to testify. In response, the State argues that the habeas court misinterpreted the law concerning the necessity of interviewing witnesses when it held in its memorandum decision that "there can be no justification for failing to, at a minimum, talk to witnesses or to have them interviewed by an investigator."

[¶35.]     There is "no per se rule that failure to interview witnesses constitutes ineffective assistance [of counsel]." *Sanders v. Trickey*, 875 F.2d 205, 209 (8th Cir. 1989). "Whether defense counsel's failure to interview witnesses renders his assistance ineffective depends on the facts of each case." *Cooley v. Nix*, 738 F.2d 345, 347 (8th Cir. 1984) (citation omitted). "However, an attorney must make a reasonable investigation and must make reasonable decisions to forgo particular investigations." *Sprik v. Class*, 1997 S.D. 134, ¶ 24, 572 N.W.2d 824, 829 (citation omitted). In assessing the attorney's reasonableness, courts are to "apply[ ] a heavy measure of deference to counsel's judgments." *Wing v. Sargent*, 940 F.2d 1189, 1191 (8th Cir. 1991) (quoting *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066).

[¶36.]     There is a distinction in our analysis of the reasonableness of trial counsel's decisions made before an investigation and those made after. "[S]trategic choices made *after thorough investigation* of law and facts relevant to plausible options are virtually unchallengeable[.]" *Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066 (emphasis added). In contrast, "strategic choices made *after less than complete investigation* are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91 (emphasis added). "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 691.

[¶37.]     Based on our review of the record, we conclude that Doody's incomplete and inadequate investigation of the facts demonstrates his representation of Schocker fell below the objective standard of reasonableness. Aside from Schocker and Officer Swanson, there were only three other people present at the scene—Doris, Morsching, and Hopkins, all of whom were identified during the investigation. Furthermore, contact information for the witnesses was collected during the investigation and was readily available to Doody. While Doody met briefly with Doris and Schocker before the trial, he did not attempt to contact Morsching or Hopkins.

[¶38.]     Although the entire incident was recorded, it was unreasonable for Doody to forgo interviewing the few witnesses present at the scene based solely on his assumption that additional interviews with the witnesses would produce nothing beyond what was in the video. Doody's testimony that his review of the

-15-

video provided him with a complete understanding of what occurred was shown to be incorrect because there were discussions that were not picked up by Officer Swanson's body camera.

[¶39.] While we generally give great deference to a trial lawyer's decisions while preparing and presenting a case, those decisions are not immune from critique—particularly decisions regarding a lawyer's investigation into the case or possible defenses. *See Randall*, 2002 S.D. 149, ¶ 7, 655 N.W.2d at 96 ("It is well settled that '[i]n reviewing trial counsel's performance, it is not this Court's function to second guess the decisions of experienced trial attorneys regarding matters of trial tactics *unless the record shows that counsel failed to investigate* and consider possible defenses[.]'" (quoting *Sprik*, 1997 S.D. 134, ¶ 24, 572 N.W.2d at 829)) (first alteration in original) (emphasis added); *see also Lyons v. Luebbers*, 403 F.3d 585, 594 (8th Cir. 2005) ("so-called 'strategic choices' by counsel based on incomplete investigation are not entitled to deference.").

[¶40.] Here, there were few witnesses, and their contact information was at Doody's disposal. Yet, he made no effort even to contact those witnesses. This decision fell below an objective, reasonable standard of performance. Considering all of the circumstances, Doody's failure to interview two of the three witnesses present during the incident was deficient.

## II. *Whether trial counsel's deficient performance was prejudicial to Schocker's case.*

[¶41.] The second prong of establishing an ineffective assistance of counsel claim requires that Schocker demonstrate Doody's deficient performance prejudiced his defense. *See Reay*, 2019 S.D. 63, ¶ 13, 936 N.W.2d at 120 (citation omitted).

Establishing prejudice is a high standard; it "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a *trial whose result is reliable*." *Spaniol*, 2022 S.D. 61, ¶ 22, 981 N.W.2d at 404 (emphasis added) (citation omitted). Prejudice exists when there is a "reasonable probability of a different outcome." *Id.* ¶ 24 (citation omitted).

[¶42.] Schocker was charged with aggravated assault as defined in SDCL 22-18-1.1(5). "The gravamen of the offense is the attempt to put a person in fear of imminent serious bodily harm." *State v. Ahmed*, 2022 S.D. 20, ¶ 15, 973 N.W.2d 217, 221 (quoting *State v. LaCroix*, 423 N.W.2d 169, 170 (S.D. 1988)). "[T]he focus [of the offense] is on what the defendant was *attempting* to do with the [deadly weapon]." *State v. Peneaux*, 2023 S.D. 15, ¶ 39, 988 N.W.2d 263, 272 (emphasis in original). What Schocker was attempting to do when he picked up the knife and began walking toward Officer Swanson was the only disputed issue.

[¶43.] The relevance and import of Hopkins's testimony to this issue is evident from a comparison of Doris's trial testimony and Hopkins's testimony at the habeas hearing. Doris testified as follows about the deer tag at trial:

> Q: Okay. Did you mention anything about the tag to Chris Schocker?
> A: I said something about cutting the tag off.
> Q: When you asked to have the tag cut off, was that before or after the officer was taking the –was taking the drag—the deer?
> A: Somewhere he was starting to drag the deer.
> Q: Okay. And do you remember what your exact words were?
> A: Cut off the tag. I think—I don't know what I said—that's about it, cut off the tag.
> …
> Q: Okay. And who did you say to cut the tag off?
> A: I said it to Chris to cut the tag off. I think I did.

> Q: To your knowledge and recollection, what did Chris do then?
>
> A: He just stood there. I thought he was just standing there.
>
> Q: Okay. But after you asked to take the tag off—
>
> A: We didn't take it off because the officer was dragging the deer away.
>
> Q: And what did Chris do during that period of time?
>
> A: Just standing there.
>
> Q: Did he try to take the tag off?
>
> A: No.

[¶44.] In contrast, Hopkins's testimony about the tag at the habeas hearing was as follows:

> Q: And then there was a time when the officer was taking the deer when there was some discussion about a tag, do you remember that?
>
> A: Yes, I do.
>
> Q: What was the discussion then?
>
> A: Chris's mom had said what about the tag and he said, no, that's coming with me. And Chris said I'm gonna cut the tag off the deer. And as he turned to his left to look for the knife he turned his head and went to pick up the knife and, you know, he walked behind the tailgate, grabbed it, and then he walked back two or three steps maybe and the game warden was, oh, he was next to his truck so he was a good ways away, you know, almost three vehicle lengths, pulled out his gun and told him to drop the knife and Chris looked at him and threw the knife down, you know, threw his hands up in the air.

[¶45.] Hopkins would have testified that before approaching Officer Swanson with the knife, Schocker said that he was going to cut the tag off the deer's leg. This additional testimony would certainly provide additional context about Schocker's conduct for the jury to consider.[8] To establish attempted aggravated assault, a general intent offense, the State needed to prove that Schocker

---

8. Contrary to the State's claim that this statement is inadmissible hearsay, it is the type of statement that may be admissible under the exception in SDCL 19-19-803(3).

intentionally performed a physical act to put Officer Swanson in fear of imminent serious bodily harm. However, this additional testimony would support Schocker's claim that he was engaged in the act of attempting to cut the tag off the deer rather than brandishing a knife at Officer Swanson. This distinction is relevant to the jury's determination as to whether the acts performed by Schocker were sufficient to put a reasonable officer in fear of imminent serious bodily harm.[9]

[¶46.] The testimony offered by Hopkins was different in character from the testimony Doris offered and consequently cannot be discounted as cumulative. *See State v. Guzman*, 2022 S.D. 70, ¶ 55, 982 N.W.2d 875, 893 (noting that "[e]vidence is cumulative when it is 'of the same character as evidence previously produced'"). Doris testified that she may have told Schocker to cut the tag off the deer, but she was unaware of any action Schocker took in response. Hopkins's testimony went much further as it would have provided the jury with the only evidence of Schocker's stated intention when he picked up the knife. Moreover, Hopkins would likely be viewed by a jury as a more objective witness than Schocker's mother.

[¶47.] An error is prejudicial when there is "a reasonable probability that, but for [the error], the result of the proceeding would have been different." *State v. Carter*, 2023 S.D. 67, ¶ 26, 1 N.W.3d 674, 686 (alteration in original) (quoting *Owens v. Russell*, 2007 S.D. 3, ¶ 9, 726 N.W.2d 610, 615). Hopkins's testimony was different from any other evidence presented at trial and went directly to the only

---

9. There were discrepancies between the events as described by Hopkins and Officer Swanson. Both witnesses would have been subject to cross-examination regarding those discrepancies. Ultimately, the jury would have resolved any conflicts in the testimony.

disputed issue on the charge of aggravated assault. Under these circumstances, there is a reasonable probability that, but for Doody's deficient performance, the result of the proceeding would have been different. We affirm.

[¶48.] JENSEN, Chief Justice, and DEVANEY, Justice, concur.

[¶49.] KERN and SALTER, Justices, concur in part and dissent in part.

KERN, Justice (concurring in part and dissenting in part).

[¶50.] I join the majority opinion in concluding that Doody's failure to interview Hopkins constitutes deficient performance. However, I am unable to conclude that, but for this error, there is a "reasonable probability" that Schocker would not have been convicted. *See State v. Carter*, 2023 S.D. 67, ¶ 26, 1 N.W.3d 674, 686. Thus, I would not affirm the circuit court's decision to grant habeas relief. As the majority details, Hopkins would have, at most, testified as follows:

> Chris's mom had said what about the tag and [Officer Swanson] said, no, that's coming with me. And Chris said I'm gonna cut the tag off the deer. And as he turned to his left to look for the knife he turned his head and went to pick up the knife and, you know, he walked behind the tailgate, grabbed it, and then he walked back two or three steps maybe and the game warden was, oh, he was next to his truck so he was a good ways away, you know, almost three vehicle lengths, pulled out his gun and told him to drop the knife and Chris looked at him and threw the knife down, you know, threw his hands up in the air.

[¶51.] The "gravamen" of aggravated assault as defined in SDCL 22-18-1.1(5) "is the attempt to put a person in fear of imminent serious bodily harm." *State v. Ahmed*, 2022 S.D. 20, ¶ 15, 973 N.W.2d 217, 221. The question thus becomes, what was Schocker trying to do by purposefully advancing toward Officer Swanson with a drawn hunting knife? Officer Swanson had just clearly expressed his intent to take

the tag along with the deer and was dragging it toward his service vehicle. A cursing and angry Schocker had just loudly yelled, "Horseshit." Based on the circumstances surrounding this incident, Schocker's actions could be reasonably viewed as menacing, approaching Officer Swanson with a knife in his hand, and intending to provoke a confrontation with him to stop him from cutting the tag off the deer.

[¶52.]      Yet, the majority contends that the alleged error in not introducing Hopkins's testimony was so significant that there is a reasonable probability that Schocker would have been acquitted if it had been introduced. However, the theory that Schocker was approaching Officer Swanson to cut off the tag was not newly introduced by Hopkins's testimony. This theory of the defense was front and center throughout the trial. In his opening statement, Schocker's counsel stated: "Then what you're gonna see is the conservation officer dragging the deer back to his truck the full eight or nine feet possibly until you hear somebody shout and you will hear it because there is a recording, *what about the tag? . . .* And the officer at that point when he sees that and hears another shout, *what about the tag*?" (Emphasis added.) Counsel again referred to Schocker's claim that he was going to cut the tag off the deer during closing argument, stating: "You have to focus in on a 15 second blurb to determine whether or not beyond a reasonable doubt he was utilizing that knife to threaten that officer or to remove a tag from a deer when we know, contemporaneously, at that same period of time, *someone was shouting what about the tag*?" (Emphasis added.)

[¶53.] In addition, Schocker's explanation of his actions had already been presented through Doris's testimony and through the body camera video in which Doris can be heard saying, "take that tag off." Hopkins's proposed testimony was of the same character as Doris's testimony, and accordingly, was cumulative. Failing to present cumulative evidence does not result in prejudice to the party. *See Winfield v. Roper*, 460 F.3d 1026, 1034 (8th Cir. 2006) (concluding the failure to present cumulative testimony is not contrary to law and there was no prejudice by counsel not calling these witnesses); *Hall v. Luebbers*, 296 F.3d 685, 693 (8th Cir. 2002) ("We conclude that failure to present cumulative evidence is neither contrary to nor an unreasonable application of the governing principles found in *Strickland*."); *State v. Johnston*, 957 S.W.2d 734, 755 (Mo. 1997) (en banc) ("Failing to present cumulative evidence is not ineffective assistance of counsel."). Contrary to the majority's position, Hopkins's testimony would have provided no new information for the jury to consider.

[¶54.] Additionally, Hopkins's proposed testimony was subject to impeachment, as it contained several discrepancies when compared with other evidence offered at trial. For example, the body camera video shows that Officer Swanson was roughly one vehicle length away when Schocker began approaching him, not three car lengths away. Further, Hopkins testified that Officer Swanson pulled out his gun. According to Officer Swanson, he reached for his gun, but he never actually took the gun out of its holster. And finally, Hopkins's testimony that when Officer Swanson told Schocker to stop walking toward him, Schocker threw the knife down and threw his hands up in the air is contradicted by the video played

at trial. The video shows that Schocker stopped moving toward Officer Swanson, turned around, set the knife down on the tailgate, and started moving to the other side of Doris's pickup.[10] Hopkins's description of the events was inaccurate and would have been subject to cross-examination and impeachment. The failure of Schocker's trial counsel to introduce testimony that would have been impeached was not prejudicial to Schocker's case. *See Davis v. United States*, 865 F.2d 164, 167 (8th Cir. 1988) (concluding the petitioner did not meet his burden of establishing prejudice from counsel's failure to present testimony, noting the "testimony could have been successfully impeached.").

[¶55.] Moreover, the jury watched the video recording of the confrontation during the trial and again during their deliberations. The existence and importance of the video recording of the encounter was mentioned only in passing by the habeas court. The jury was in the best position to determine the nature of the confrontation. Schocker has failed to show that there is a reasonable probability that but for the absence of Hopkins's testimony, which was cumulative and replete with inconsistencies, he would have been acquitted. For the foregoing reasons, I respectfully dissent.

[¶56.] SALTER, Justice, joins this writing.

---

10. This is shown at approximately 13:35 of the video.